**Lasandra BERRY, Plaintiff,**

v.

**CROWN EQUIPMENT CORPORATION, Defendant.**

**No. 99–CV–73530–DT.**

United States District Court, E.D. Michigan, Southern Division.

Aug. 16, 2000.

Carl L. Collins, III, Detroit, MI, for plaintiff.

Daniel J. Scully, Jr., Detroit, MI, for defendant.

## OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Lasandra Berry was injured while driving a stand-up forklift manufac-

tured by Defendant Crown Equipment Corporation. In her Amended Complaint, Plaintiff claims that the forklift she was driving (the "Crown 35RRTT") was defectively designed and alleges as theories of recovery breach of implied warranties (Count I) and negligence (Count II).

This action is presently before the Court on Defendants' Motion for Summary Judgment. Plaintiff has responded to Defendant's Motion. Having reviewed and considered the parties briefs and supporting documents, and having heard the oral arguments of counsel at the hearing held on August 10, 2000, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. *PERTINENT FACTS*

Plaintiff Lasandra Berry is an employee of Technicolor Video ("Technicolor"). On July 30, 1998, Plaintiff was working as a material handler in Technicolor's Inventory Control department. As part of her duties as a material handler, Plaintiff moved products (videotapes) from one location to another in the company's warehouse using a stand-up end controlled forklift manufactured by Defendant Crown Equipment Company.

A standup forklift is one that the driver operates while standing within the confines of the machine. An operator controls the forklift with a combination of a multi-function control handle, a steering tiller, and a floor brake pedal. To control the direction of travel, speed, and several other functions, the operator uses the multi-function control handle with her right hand. With her left hand, the operator uses the steering tiller. In order to stop the forklift, the operator can use the spring-loaded floor pedal (the "deadman brake pedal") located on the floor board of the operator's compartment. The deadman brake pedal

works in a manner opposite to that of an automobile. The deadman brake is activated by the operator lifting her left heel allowing the pedal to rise from the floor board and engage the brake system. In operating the brake, the operator's foot remains in contact with the elevating pedal. When depressed, the deadman brake pedal is separated from the rest of the floor board by a ridge of approximately ¾ inch. Similarly, there is a ridge approximately 1½ inch high to the outside of the operator's foot.

Another braking mechanism available to the operator is commonly referred to as "plugging." "Plugging" is accomplished by using the multi-function control handle of the forklift as follows. If an operator is traveling with the forks trailing and wishes to stop, the operator reverses the position of the multi-function control handle. This action changes the direction in which the forklift is traveling, reverses the polarity of the electric motors, and thus slows down the forklift. At the point where the forklift has stopped and before it begins traveling in the opposite direction, the operator can either release the multi-function control handle or place it in "neutral," either of which ensures that the forklift will remain in the stopped position. (Should the operator maintain the control handle in the reverse position, the forklift would begin traveling in the "forks-forward" direction.)[1]

The stand-up forklift at issue in this action had no door blocking the opening to the operator compartment. According to the record evidence presented in this case, of the 77,000 stand-up forklifts manufactured by Crown, only approximately 350 were equipped with doors of any kind, and only a handful of those remain in use today because all but one customer has removed the doors.[2]

---

**1.** Although Plaintiff alleged in Paragraph 8 of her First Amended Complaint that the brakes failed, at oral argument, Plaintiff's counsel stipulated that Plaintiff has dropped her

claims of manufacturing and design defect concerning the forklift brakes.

**2.** Crown states that its testing and studies have demonstrated that a door delays an op-

Plaintiff testified in her deposition that she was trained by Technicolor on the use and operation of stand-up forklifts. She also testified that by "common sense," she knew to keep her hands and feet inside the operator's compartment and that if any part of her body were outside the confines of the compartment, she could get hurt. *See*, Plaintiff's Deposition, pp. 34–35, Defendant's Ex. C. She further testified that while she was specifically instructed that while operating the forklift, she was to always look in the direction in which the forklift was traveling. *Id.* at p. 35.

Despite Plaintiff's training and common sense, Plaintiff admitted that on occasion she would operate the stand-up forklift with her foot hanging outside the operator's compartment. *Id.* at 49–50. She testified that it was a "comfort thing," that she would "get tired of standing" and "get restless" and so she would often drive for a while with her foot stretched out. *Id.*

On July 30, 1998, Plaintiff began her day at 6:00 am., and operated the stand-up forklift at issue without incident or complaint for four hours. At approximately 10:30 a.m., Plaintiff proceeded to park the forklift so that she could take her second morning break. Plaintiff claims that she was driving the machine with forks trailing, and was approximately 10 to 15 feet from a structural beam. She attempted to

apply the brakes to stop the forklift but she claims that the brakes failed to engage and the forklift collided with the beam. Plaintiff was injured when part of her left foot—which was resting outside the confines of the operator's compartment—was crushed between the forklift and the beam. As a result of the accident, Plaintiff had two and a half toes amputated.

Although at her deposition, Plaintiff stated that she "could not recall" whether she had her foot outside of the operator's compartment at the time of the accident, as indicated above, Plaintiff admitted that she often would operate the forklift with one foot hanging outside of the confines of the compartment. Furthermore, one of Plaintiff's co-workers who witnessed Plaintiff operating the forklift just prior to and at the time of the collision testified that Plaintiff's left foot was outside the operator's compartment for the entire time leading up to the collision, *see* Lewis Dep., pp. 15–16, and Plaintiff does not dispute Ms. Lewis's testimony, nor has she presented any contradictory testimony.[3]

On June 21, 1999, Plaintiff instituted this product liability action in Wayne County Circuit Court. Defendant Crown Equipment timely removed the action to this Court on diversity of citizenship grounds.

---

erator's exit from the machine in the event of an emergency thereby increasing the risk of injury in tip-over and off-the-dock accidents. Consequently, neither the government nor any standards organization in the world requires doors on stand-up forklifts. Crown further avers that it does not provide doors to any customer for a warehouse application such as that at Technicolor. Crown has sold a "very small number" of solid steel doors to block the opening of the operator compartment on forklifts provided to specific customers based upon individualized environmental concerns. These doors were requested not to contain the operator within the compartment but rather to prevent spear-like objects from intruding into the compartment. Wire mesh doors were sold "many years ago" by Crown upon request of one specific customer, K-mart. However, Crown states that to its knowledge, all of these doors have all been removed or are being removed by K-mart.

*See* Crown's Supplemental Response to Plaintiff's Interrogatory No. 19, Defendant's Ex. B.

3. Another employee, Craig Matthews, testified that he was about 30 feet away from the beam with which Plaintiff collided and that in the seconds before the accident, he observed Plaintiff traveling at faster than normal rate of speed. *See* Matthews' Deposition, pp. 19, 24, Defendant's Ex. D. He further testified that Ms. Berry appeared to be looking down as if she were writing something, and never looked up in the direction in which she was traveling. *Id.* pp. 19, 24, 28–29. Another employee, Richard Smiley, who also observed Plaintiff prior to and at the time of the collision, corroborated Craig Matthews' testimony that Ms. Berry was traveling with her head down when she collided with the beam. [Smiley Dep., pp 34, 46, Defendant's Ex. E].

Plaintiff contends that the Crown 35RRTT stand-up forklift was defective due to Crown's failure to have doors enclosing the operator compartment to prevent the operator's foot from extruding beyond the confines of the compartment.[4]

Discovery has now closed and Defendant timely moved for summary judgment in its favor on several grounds. First, Defendant argues that Plaintiff's safety expert, George Bombyk, is not qualified under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to render an expert opinion as to any alleged design defect in this case and, therefore, his testimony should be disregarded in its entirety. Second, Defendant argues that even assuming *arguendo* that Mr. Bombyk may be qualified as an expert, Bombyk failed to offer any testimony as to any alternative design or the feasibility of such an alternative design. Lacking such expert testimony, Plaintiff is unable to establish a *prima facie* design defect claim or a claim of breach of implied warranties under Michigan law. Last, Defendant argues that even if Plaintiff has made out a *prima facie* case, Crown is entitled to at least partial summary judgment on Plaintiff's claim for non-economic damages because Plaintiff has not sustained a "permanent loss of a vital bodily function," which is required under Michigan law in order to recover such damages. Plaintiff has responded to each of Defendant's arguments.

**4.** Plaintiff's expert, George Bombyk, also testified that in his opinion the forklift's floor brake pedal mounting was defective in that he believed that a "barrier" between the foot pedals would prevent inadvertent cross-over depression of the brake pedal by the non-braking foot (resulting in the disengagement of the braking mechanism). However, as indicated in note 1, *supra*, Plaintiff is not pursuing this theory. Her only claim of defect is the failure to enclose the passenger compartment to ensure foreseeable exiting of the operator's left foot and/or the lack of a bumper to assure a clear distance between a fixed object and the open compartment upon impact. *See* Plaintiff's Response, ¶¶ 15–16.

## III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[5] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of princi-

(Plaintiff, however, presented no evidence whatsoever that the forklift was defective because of the lack of a "bumper." Therefore, the only design defect issue remaining in this case is the lack of a door blocking the opening to the operator compartment.)

**5.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

ples to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

Betkerur v. Aultman Hospital Association, 78 F.3d 1079, 1087 (6th Cir.1996). See also, Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479–80 (6th Cir.1989).

B. *MR. BOMBYK IS NOT QUALIFIED TO RENDER AN EXPERT OPINION CONCERNING ANY ALLEGED DESIGN DEFECT IN THE CROWN 35RRTT STAND–UP FORKLIFT*

1. *THE FOUNDATIONAL REQUIREMENTS OF FED.R.EVID. 702 AND DAUBERT*

Rule 702 of the Federal Rules of Evidence regarding expert testimony provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court established guidelines for district courts to use in determining the admissibility of expert testimony pursuant to Rules 702 and 104 of the Federal Rules of Evidence. Although it recognized that the evaluation of expert testimony is generally left to juries, the *Daubert* Court emphasized the trial judge's "gatekeeping" role with respect to expert proof on scientific or technical issues. *Id.* at 597–98, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.[6]

---

**6.** Plaintiff argues that *Daubert* applies only to "scientific" testimony, not "technical" testimony such as that proffered by Mr. Bombyk in this case. In support of this contention, Plaintiff cites an unpublished Sixth Circuit decision, *Christ v. Sears, Roebuck & Co.,* 149 F.3d 1182 (6th Cir.1998). In *Christ,* the appellate panel relied upon *United States v. Jones,* 107 F.3d 1147, 1158 (6th Cir.1997), in which the court held that *Daubert* only applied to scientific evidence and does· not create a new framework for analyzing proffered expert testimony based upon "technical or other specialized knowledge." However, to

the extent *Christ* and *Jones* found *Daubert* inapplicable to "technical" testimony, those cases were effectively overruled by the Supreme Court's 1999 decision in *Kumho Tire Company v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In *Kumho,* the Supreme Court reiterated *Daubert* 's central holding that trial judges must perform a gatekeeping role as to *all* proffered expert testimony and made it clear that trial courts may consider the *Daubert* factors in assessing the reliability of all types of expert testimony, including both "scientific" and "technical" evidence. *Id.,* 119 S.Ct. at 1174–6.

■ To qualify as an expert under Rule 702, a witness must first establish his expertise by reference to "knowledge, skill, experience, training, or education." FRE 702. Although this requirement has always been treated liberally, as the Sixth Circuit recently observed in *Pride v. BIC Corporation*, 218 F.3d 566 (6th Cir.2000), that liberal interpretation of this requirement "does not mean that a witness is an expert simply because he claims to be." (citing *In re Paoli RR PCB Litigation*, 916 F.2d 829, 855 (3rd Cir.1990)). The court is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir.1997). Thus, the trial court must determine whether the expert's training and qualifications relate to the subject matter of his proposed testimony. *Smelser, supra,* 105 F.3d at 303. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1178, 143 L.Ed.2d 238 (1999) ("The trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case.") *See also, Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir.1994), *cert. denied,* 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995) (A proper foundation for a technical expert demonstrates "first hand familiarity" with the subject of the testimony); *Isely v. Capuchin Province,* 877 F.Supp. 1055, 1063–4 (E.D.Mich.1995) (The initial foundational requirement a proponent of expert testimony must meet is to establish that the witness is qualified by virtue of his or her education and training to give an expert opinion concerning the matter in question.)

■ Once the proposed expert has crossed the foundational threshold of establishing his personal background qualifications as an expert, he must then provide further foundational testimony as to the validity and reliability of his theories. *Isely, supra,* 877 F.Supp. at 1064; *Daubert,*

*supra,* 509 U.S. at 590, 113 S.Ct. 2786 ("Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known."). By defining evidentiary reliability in terms of scientific validity, the *Daubert* Court instructed district courts that their primary function as "gatekeepers" is "to determine whether the principles and methodology underlying the testimony itself are valid"—not to second guess the validity of conclusions generated by otherwise valid methods, principles, and reasoning. *United States v. Bonds,* 12 F.3d 540, 556 (6th Cir.1993). Although there is no single criterion for determining whether a specific scientific methodology is reliable, the *Daubert* Court identified several factors that a district court should consider when evaluating the scientific validity of expert testimony, notably: the testability of the expert's hypotheses (whether they can be or have been tested), whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community. *See Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786; *Pride v BIC Corp., supra. See also,* Amendments to Fed.R.Evid. 702 (effective December 1, 2000) (". . . [A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*") The *Daubert* factors, however, do not constitute a "definitive checklist or test," but rather must be "tied to the facts of [the] particular case." *Kumho Tire Co., Ltd. v. Carmichael, supra,* 119 S.Ct. at 1175.

■ In ¬fulfilling its "gatekeeping" duties the Court is not required to hold an actual evidentiary/*in limine* hearing to comply with *Daubert;* however, the Court

must make a determination of the proposed expert's qualifications and an assessment of the relevance and reliability of his proffered testimony. *See, Greenwell v. Boatwright,* 184 F.3d 492, 498 (6th Cir. 1999);. *Clay v. Ford Motor Co.,* 215 F.3d 663, 667 (6th Cir.2000); *Morales v. American Honda Motor Co., Inc.,* 151 F.3d 500, 516 (6th Cir.1998). *C.f., Kumho Tire Co., Ltd. v. Carmichael, supra,* 119 S.Ct. at 1176 (abuse of discretion standard applies to the trial court's decision as to whether a hearing is needed to determine reliability of an expert).

With the foregoing standards in mind, the Court will examine the deposition testimony of Plaintiff's expert, George Bombyk.

## 2. *THE TESTIMONY OF GEORGE BOMBYK*

In support of her claim that the Crown 35RRTT stand-up forklift was defectively designed because it did not have a door on it to block the opening to the operator's compartment, Plaintiff offered the testimony of George Bombyk.

### a. *BOMBYK'S QUALIFICATIONS*

█ George Bombyk is a self-employed "safety consultant." He considers himself to be an expert in accident prevention and safety. ("The only areas I hold myself to be an expert in is accident prevention and safety." [Defendant's Ex. K, Bombyk Dep. p. 54.]) He earned a Bachelor of Science degree from Eastern Michigan University with a major in speech and minors in English and science in 1955. [Bombyk Dep. p. 9 *See also,* Ex. K (Bombyk CV) ] He holds no graduate degrees; his post-baccalaureate education consisted of classes he took "on and off" from 1955 to 1980. *Id.* at p. 10. These classes consisted of personnel/management/human relations courses at Wayne State University and numerous safety training seminars he attended at the Chrysler Training Institute. *Id.* Prior to going into the "safety consulting" business, Mr. Bombyk worked

in automobile manufacturing at a number of Chrysler manufacturing plants in the Metropolitan Detroit area. *See Ex. K.* He also worked for one year as a Safety Director for Kelsey–Hayes Corporation in 1979–80, and for one year with the National Safety Council in 1980–81. *Id.*

Mr. Bombyk has never published any articles in any professional journals or treatises regarding forklifts. (In fact, he testified that the only article he ever wrote was published in 1980 and that article concerned butane lighters. [Bombyk Dep. p 8.])

Mr. Bombyk is a member of the National Safety Council (the "NSC") and the World Safety Council, however, he has never held any leadership position with either organization. *Id.* at 16–17. He testified that he became a member of the NSC while he worked at Chrysler because "Chrysler belonged to and sponsored the National Safety Council" and "everybody belonged to it." *Id.* at 11. His current membership in that organization is a deferred membership—he pays dues to the South Eastern Michigan Safety Council and that local organization belongs to the NSC. *Id.* The only safety standards committee that Mr. Bombyk has ever served on was the ANSI standards committee on safety shoes. *Id.* at 16.

With respect to his involvement with forklifts, Mr. Bombyk testified that he last worked as a forklift operator in 1949. *Id.* at 29. He operated a "sit-down" forklift manufactured by either Clark Equipment or Yale; he has never worked on a stand-up forklift. *Id.* Although he is "familiar" with forklifts by virtue of having worked in manufacturing plants where forklifts are used, he has never been employed as forklift service technician or by a forklift manufacturer, nor has he ever attempted to service a forklift. *Id.* at 30–31.

With respect to forklift design, Mr. Bombyk testified that he never designed any product connected with the safety of forklifts that went into production. *Id.* at

24. He stated that he did put "a curved kind of horseshoe-shaped back guard" and a "padded seat" for comfort on one of two sit-down forklifts used at the Chrysler plant he worked at from 1956 to 1960. *Id.* at 24–25. And, although he talked to some safety people at Chrysler about putting doors on stand-up fork lifts at some point in time prior to leaving the company in 1975, he did not design or install any doors on the machines. *Id.*

Bombyk testified that in his present consulting business, he spends 95–98% of his time in litigation-related activities. *Id.* at 39. He does not have any laboratory facilities, and the only equipment he has is equipment he uses for measuring "slip and falls." *Id.* at 40.

b. *BOMBYK'S INVOLVEMENT WITH FORKLIFT SAFETY AND THE CROWN 35RRTT AT ISSUE IN THIS CASE*

With respect to research done in this case, Bombyk testified that he came into the case because the expert Plaintiff first contacted, John Sevart, was now in Australia. *Id.* at 58–59. Bombyk was provided with a four-inch thick package of materials assembled by Mr. Sevart consisting of approximately 1,000 pages regarding forklift trucks history, background and testing done by ATI. *Id.* at 61–62. Bombyk testified that some of the material he scanned, some he read. *Id.* at 62. Included in these materials was an analysis of approximately 800 forklift accident reports prepared by Mr. Sevart in September of 1994. *Id.* at 75, 77. Bombyk testified that he reviewed Sevart's accounts of accident reports, and "based upon the injury, where the injury occurred, the circumstances that they listed," he concluded that there were instances "where either overhead posts or safety doors would have prevented or minimized the injuries." *Id.* at 76. Bombyk testified, however, that he did not read the 800 accident reports himself and did not independently cross-check or verify Sevart's accounts of the accidents or his measure-

ments; all he read was a summary prepared by Mr. Sevart. *Id.* at 76, 78 He stated that although he didn't independently verify the numbers that Mr. Sevart used in his analysis, he "ha[d] a high reliance and belief in Mr. Sevart's methods." *Id.* at 76.

Bombyk testified that he did not interview or talk with anybody at Technicolor or Crown concerning Plaintiff's accident and only spoke with Plaintiff herself once, for a few hours in December 1999. *Id.* at 79. Nor has Bombyk ever driven or examined the Crown 35RRTT forklift at issue in this case, *Id.* at 105–107. In fact, he could only recall one occasion in 1992 or 1993 where he operated a stand-up forklift for approximately five minutes. *Id.* at 45–47. He testified that he has never performed any tests or experiments on any make or model of forklift. *Id.* at 105–7.

Bombyk further testified that he has done no studies or experiments concerning the efficacy of adding a door to a forklift. *Id.* He explained:

I don't know that you need to do any testing. Personally, I think it's all a bunch of bologna for this reason. You've got doors on your houses. You've got doors on cars. You put them on cars to keep the kids from falling out and the dog and the cat from falling out. You're keeping another car's bumper from running inside the car. You put doors on there to protect people. And keep them within the confines of the vehicle. That principle applies to a forklift.

*Id.* at 123–24; *See also* 107–8.

He added:

All [that] the industrial fork truck manufacturers need to do is look at the history of accidents and how they occur and ... based on the statistics and history of these accidents and how they occur and the extent of the injuries, they don't need to test the doors. The evidence is

there from an accident viewpoint and that's the only test that I used on that. *Id.* at 135.

Bombyk further testified that he has done no tests timing entry and exiting times from forklifts with doors. *Id.* at 108. While he acknowledged that he is aware that Crown has tested the time that would be required to exit from a latched door on a forklift in the event of a tip-over or other accident, he admits that he has not reviewed Crown's tests, and that his criticism of Crown's tests showing that because of the time it would take to unlatch a door in cases of emergency it was safer not to have a door is based solely upon Mr. Sevart's criticism of the tests. *Id.* at 114.[7] He stated that it was his opinion that if a forklift tips over or goes off the end of a loading dock, it is safer for the operator to stay in the truck. *Id.* He testified that this opinion was based upon his personal experience in three car accidents where he was wearing a seatbelt which kept him inside the car: "I walked away from all [of the accidents] without any broken bones or bleeding." *Id.* at 125. Bombyk admitted, however, that from the speed and kinetic forces are not the same with cars and forklifts. *Id.*

Although Mr. Bombyk's view is that the Crown 35RRTT that Plaintiff was driving at the time of her accident was defectively designed because it did not have as a standard feature a door blocking the operator's compartment opening, he acknowledged that open compartments are the standard in the industry. *Id.* at 110.

When asked whether he was aware of anyone else who agreed with his opinion that a door should be added to the forklift as standard equipment, he stated "Well, I imagine there's some people out there, but I don't know them personally." *Id.* at 147. He further testified that he knows of no government, industry or internal company standard of a user that either requires or recommends doors on stand-up riders. *Id.* at 153.

Applying *Daubert* and its progeny to George Bombyk's testimony in this case, the Court finds both that Mr. Bombyk lacks the qualifications necessary to render an expert opinion regarding the alleged design defect of the Crown stand-up forklift upon which Plaintiff's claims in this case are predicated and that Mr. Bombyk's particular theory of liability in this case is not supported by sound technical reasoning or methodology. By his own deposition testimony, Mr. Bombyk has demonstrated that he does not possess the requisite "knowledge, skill, experience, training or education" to render an opinion on defective forklift design. He has no formal engineering education or background and is neither a mechanic nor a biomechanic, nor does he claim any expertise in human factors engineering or biomechanics. He has never published any forklift-related articles and his only experience with forklifts was more than 20 years ago, while he was working for Chrysler Corporation. Further, his only experience with forklift design involved his placement of "a curved kind of horseshoe-shaped back guard" and a "padded seat" for com-

---

7. During discovery in this case, Plaintiff requested among her Document Production Requests that Defendant produce copies of "all records reflecting tests, experiments, studies and surveys conducted by Defendant or by outside parties on the behalf of Crown or other lift truck manufacturers" and copies of "all documents relating to reports or accidents or complaints involving the model of Crown forklift which is the subject of this litigation." *See* Plaintiff's Second Request for Production of Documents, attached as Ex. A to the Affidavit of Daniel J. Scully, Jr. In response to Plaintiff's Request, Defendant identified a number of tests and reports concerning the use of a door on stand-up forklifts, and accident reports involving the Crown 25RRTT forklift. [Scully Affidavit and Ex. B–D attached thereto.] Because some 7,000 pages of documents were identified, Defendant invited Plaintiff to review them in defense counsel's office and advised Plaintiff's counsel that copies of any documents Plaintiff wanted would be made for her. *Id.* Neither Plaintiff nor Plaintiff's expert ever went to review the documents and never requested that Defendant make any copies of any of the documents. *Id.*

fort on one of two sit-down forklifts used at the Chrysler plant he worked at forty years ago. He has no experience with respect to safety doors to enclose the operator's area and, apparently, he is not well-versed in either the industry literature in this area or testing data related to safety doors. Although Mr. Bombyk has some general experience in workplace safety, that experience was principally in the area of OSHA compliance.

Any opinion rendered by Mr. Bombyk concerning defective design of the forklift due to the lack of a door enclosing the operator's compartment goes beyond his expertise in accident prevention and safety. In *Smelser v. Norfolk Southern Ry. Co., supra,* the Sixth Circuit reversed a $1,668,000 judgment entered in favor of the plaintiff after a jury trial on a claim of defective design of a seat belt on a truck owned by his employer because the appellate court determined that plaintiff's expert's opinion testimony concerning the cause of plaintiff's injuries went beyond his expertise as a biomechanic. 105 F.3d at 305. Plaintiff, however, points to *Morales v. American Honda Motor Co., Ltd.,* 151 F.3d 500 (6th Cir.1998), and argues that Mr. Bombyk has the same qualifications as the design defect expert who was permitted to testify in that case.

In a 2–1 divided opinion in *Morales,* the Sixth Circuit determined that the plaintiff's expert, Bill Kitzes, was qualified to render an opinion in that case regarding the alleged unsafe design of the motorbike at issue and the need for a "safety flag" on the bike even though he had did not have an engineering degree nor any training or experience in designing motor bikes. Although this Court has serious doubts as to whether Mr. Kitzes was even marginally qualified to render an expert opinion in *Morales,* a comparison of Mr. Bombyk's and Mr. Kitzes' qualifications demonstrates that Bombyk's qualifications do not measure up to even those of Kitzes.

While it is true that Mr. Kitzes did not have an engineering degree (he had a Bachelors degree and a law degree), he had completed 50 hours of course work in human factors engineering at the University of Michigan, was certified in safety management by the American Society of Safety Engineers, and was board certified in Products Safety Management and Hazard Control Management. *See Morales,* 151 F.3d at 520 (Kennedy J., dissenting opinion). He had also been employed by the Consumer Product Safety Commission, where he worked in the Product Defect Identification division for a number of years prior to forming his own "Consumer Safety Associates" company. *Id.,* 151 F.3d at 515. He was also a member of the American Society of Safety Engineers, the Human Factors Society, the Board of Product Safety Management, the Board of Certified Product Safety Management, the Certified Hazard Control Management and Systems Safety Society. *Id.*

By contrast, in this case, Mr. Bombyk has a Bachelors degree in speech and English, and did some sporadic post-baccalaureate course work more than 20 years ago in personnel and human resources. Thus, unlike Mr. Kitzes who had at least completed 50 hours of human factors engineering, Mr. Bombyk's formal education was wholly unrelated to engineering and safety. His only safety education consisted of training seminars related to his plant manager job at Chrysler Corporation. Further, Bombyk's only on-the-job safety employment was 20–21 years ago worked when he worked for one year as a Safety Director Kelsey–Hayes and for one year with the National Safety Council. By comparison, Mr. Kitzes was employed for a number of years in the Office of Product Defect Identification of the Consumer Products Safety Commission. Unlike Kitzes, Bombyk holds no certification in safety management and his professional affiliations are essentially merely "sign up and pay your dues" memberships.

The foregoing demonstrates the fallacy in Plaintiff's reliance on *Morales* for the proposition that her expert's qualifications

are equal to the even minimal qualifications of the expert in that case.

At the hearing on this matter, Plaintiff's counsel also argued that the Court should deem Mr. Bombyk qualified on forklift design because he had provided testimony as an expert on a Clark forklift in 1995 "in a court in Cleveland." However, Plaintiff's counsel did not know the specific nature of that action, and did not know whether it was in a state or federal court. Further, he did not know whether Mr. Bombyk was subjected to a *Daubert* inquiry in that case. Therefore, the Court finds no support for qualifying Mr. Bombyk as an expert in this case based on his having previously provided expert testimony concerning a forklift in a court in Ohio.

■ However, even assuming *arguendo* that Mr. Bombyk has sufficient professional and technical background qualifications and experience to render an expert opinion concerning the alleged design defect in this case, Mr. Bombyk's opinions are quite simply unsupported by any reasonable measure of technical data or foundation and are wholly unreliable. It is Plaintiff's burden to establish by a preponderance of evidence that her expert's theories are reliable and adequately supported by sound technical data, methodology and testing. *See Smelser, supra,* 105 F.3d at 303. As indicated, in assessing reliability, the court is to focus on "the soundness of the expert's methodology." *Smelser, supra,* 105 F.3d at 303. In making this inquiry, *Daubert* instructs that courts should determine (1) whether the proposed expert's theory has been tested; (2) whether it has been subject to peer review and publication; (3) the rate of error associated with the methodology; and (4) whether the theory or methodology has been generally accepted in the particular scientific community. *Daubert, supra,* 509 U.S. at 593–4, 113 S.Ct. 2786; *Pride v. BIC Corp., supra,* slip

op. at 3. *See also,* Amendments to Fed. R.Evid. 702 (to take effect December 1, 2000).

As Defendant notes, courts interpreting *Daubert* have considered testability of the expert's theory to be the most important of the four factors, and this is especially true in cases involving allegations of defect in product design, as opposed to cases involving medical and pure scientific theories, which will be subjected to rigorous peer review. Thus, where, as here, the proffered expert has performed no reliable testing of his theory, courts, including the Sixth Circuit, have routinely precluded the witness from offering an expert opinion. *See, e.g., Pride v. BIC, supra* (summary judgment in favor of the product liability defendant proper where plaintiff's only expert's theory was unsupported by reliable testing); *Smelser v. Norfolk Southern Ry. Co., supra,* 105 F.3d at 304–5 (where plaintiff's expert failed to perform any testing on the alleged defective seatbelt, the expert's opinion should have been excluded); *Cook v. American S.S. Co.,* 53 F.3d 733, 739 (6th Cir.1995) ($100,000 judgment in favor of plaintiff vacated where the district court permitted an expert qualified in testing and failure analysis to offer an opinion that a marine rope had failed from exposure to a torch, where only "test" performed by the expert was to visually examine the frayed end of the alleged defective line with the naked eye and under a low power microscope). *See also, Stanczyk v. Black & Decker, Inc.,* 836 F.Supp. 565, 567 (N.D.Ill.1993) (defendant's motion *in limine* to exclude expert testimony granted where plaintiff's expert offered "no testable design to support his concept.")

In this case, Mr. Bombyk has not performed any testing whatsoever of the stand-up forklift model in question and never reviewed the tests performed by Crown.[8] Indeed, he admitted that he has

---

8. As noted *supra,* Plaintiff was afforded every opportunity in discovery to examine and copy records of testing, experiments, studies, surveys, and accident reports but neither Plaintiff, nor Plaintiff's counsel, nor Mr. Bombyk took advantage of that opportunity. *See* note 7, *supra.*

not even examined the particular lift in question. Further, he has not tested his hypothesis regarding the inclusion of a door on the forklift against other possible safety risks. Rather, he attempts to prove his theory based solely on the occurrence of Plaintiff's accident, opining that doors were needed simply because Plaintiff's "foot was outside and it was crushed between the truck and the beam, and there was nothing there to prevent her foot from being in that position [outside of the operator's compartment]." [Bombyk Dep. at 116.] (How this rather basic application of the laws of the physical world constitutes "expert opinion" is not clear to the Court.) As the court observed in *Nemir, supra*, "[without supporting empirical evidence, hypotheses rarely if ever move outside the realm of conjecture and speculation.]" 60 F.Supp.2d at 672. Clearly, Mr. Bombyk's theory of design defect in this case is based on nothing more than conjecture and speculation. His failure to test any of his theories render his defective design opinion unreliable and inadmissible. *See Daubert*, 509 U.S. at 593–4, 113 S.Ct. 2786.

With respect to the remaining *Daubert* factors—peer review and publication, rate of error and general acceptance—Mr. Bombyk cannot satisfy these factors either. First, he has never published anything dealing either generally with the design of stand-up forklifts of any manufacturer (much less Crown's) nor has he written anything concerning his particular theory of design defect, that an enclosing door to the operator's compartment is re-

quired to keep the operator, and her limbs, inside during operation. And he has admittedly not subjected his theories to peer review. [Bombyk Dep. 74–5; 114.] [9] Second, he has provided no empirical testing information concerning his theories' rate of error. Finally, Mr. Bombyk could not establish that his theories are generally accepted in the forklift manufacturing and design community. In fact, he acknowledged that the industry standard is overwhelmingly contrary to his view and that other than John Sevart, he knows of no one else who shares his opinion that safety concerns dictate that doors should be standard equipment on stand-up forklifts. Accordingly, Plaintiff has failed to establish that Mr. Bombyk's opinions represent reliable scientific knowledge.

Based upon the foregoing, the Court finds that George Bombyk has not met the foundational requirements to offer expert testimony regarding the alleged defective design of the Crown 35RRTT stand-up forklift at issue in this case. Therefore, his testimony will be excluded and disregarded.

C. *THE INADMISSIBILITY OF PLAINTIFF'S EXPERT RENDERS PLAINTIFF'S PRODUCT LIABILITY CLAIM RIPE FOR SUMMARY JUDGMENT*

■ George Bombyk being Plaintiff's sole design defect expert,[10] and the Court

---

9. The only evidence upon which Mr. Bombyk relied was a document created by John Sevart, another purported expert in the field. However, Mr. Bombyk was unaware whether that document was ever subject to peer review or publishing. [Bombyk Dep., pp. 74–5; 114.]

10. On March 24, 2000, Magistrate Judge Morgan struck Plaintiff's other three proposed design defect expert witnesses based upon Plaintiff's failure to produce those experts for deposition in violation of a previous Order issued on January 31, 2000 by the Magistrate Judge compelling Plaintiff to produce the experts for deposition by February 28, 2000.

(The Court's scheduling Order, in fact, was extended by 30 days to accommodate the additional time for Plaintiff to produce her witnesses.) As the Sixth Circuit recently observed *Pride v. BIC Corp.*, district courts have broad discretion to exclude untimely expert-witness testimony, holding in that case that the magistrate judge and district judge committed no error in denying the plaintiff's motions to modify the scheduling order to allow her to present additional expert witnesses. *See also, Trilogy Communications v. Times Fiber Communications*, 109 F.3d 739 (Fed. Cir.1997) (upholding the exclusion of untimely expert witness reports and affidavits that

having determined that Bombyk's testimony is inadmissible, Plaintiff has no expert testimony to support her design defect claim. This lack of evidence entitles Crown to summary judgment on her design defect claim as a matter of law.

In *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 365 N.W.2d 176 (1984) and *Owens v. Allis–Chalmers Corp.*, 414 Mich. 413, 326 N.W.2d 372 (1982), the Michigan Supreme Court established that in order to establish a *prima facie* case of design defect, a plaintiff must present "data or other factual evidence concerning the magnitude of the risks involved, the utility or relative safety of proposed alternatives, or evidence otherwise concerning the 'unreasonableness' of risks arising from [the alleged defect]." *Owens*, 414 Mich. at 431–32, 326 N.W.2d 372. The mere assertion by an expert that a proposed alternative would have been "safer" is insufficient to create an question of fact as to whether or not the chosen design was "defective." *Id.;* *Fisher v. Kawasaki,*, 854 F.Supp. 467, 471 (E.D.Mich.1994). The plaintiff bears the "heavy burden" of making a showing—via compelling, empirical evidence of an alternative design—that the chosen design was unreasonably dangerous. *Id.* Such empirical evidence "must objectively show acceptability, utility, feasibility (including cost), and general safety of the proposed alternative design vis-a-vis the allegedly defective design." *Id.* An expert's mere reference to, or description of, alternative designs, without addressing how practicable the manufacture of these designs would be or the estimated costs of production of these alternative designs, "is not sufficient, as a matter of law, to invite the trier of fact to consider the alternatives and risks faced by [the defendant] at the time it manufactured the product in ques-

tion and to determine whether in light of these, it exercised reasonable care in making the design choices it made." *Id.*, 854 at 471–72. *See also, Gawenda v. Werner Co.*, 932 F.Supp. 183, 187 (E.D.Mich.1996), *aff'd*, 127 F.3d 1102 (6th Cir.1997) (to make out a *prima facie* design defect case, the plaintiff must present sufficient evidence concerning both the magnitude of the risk involved with the defendant's allegedly defective design and the reasonableness of plaintiff's proposed alternative designs).

Applying the foregoing standards to the instant case, the Court finds that Plaintiff has failed to make out a *prima facie* case of design defect. Here, Plaintiff's proffered expert, Mr. Bombyk, has offered no evidence as to the magnitude of the risk of the open operator's compartment on the Crown 35RRTT forklift, nor has he established—through data or other factual evidence—the reasonableness of his theory concerning doors on the compartment. In the absence of expert testimony concerning reasonableness of the plaintiff's proposed alternative design, a manufacturer is entitled to entry of judgment as a matter of law. *See Gawenda v. Werner Co., supra*, 932 F.Supp. 183, 188; *Lawrenchuk v. Riverside Arena, Inc.*, 214 Mich.App. 431, 435, 542 N.W.2d 612 (1995) (failure to produce expert testimony regarding alternative designs renders design defect claim ripe for summary disposition).

## D. *PLAINTIFF'S CLAIM OF BREACH OF IMPLIED WARRANTIES ALSO FAILS*

■ In addition to her claim of defective design, Plaintiff also has alleged a claim of "breach of implied warranties of merchantability and fitness for a particular pur-

violated the court's scheduling order); *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710 (3rd Cir.1997) (upholding the exclusion of an expert's testimony as a sanction for the nonmoving party's violation of pretrial discovery orders.) (Both *Trilogy* and *Konstantopoulos* were cited with approval by the Sixth Circuit in *Pride*.)

Plaintiff has filed "objections" to Magistrate Judge Morgan's March 24, 2000 Order. The Court finds no error in the Magistrate Judge's ruling. Therefore, the Magistrate Judge's March 24, 2000 Order is AFFIRMED.

pose." (*See* Plaintiff's First Amended Complaint, Count I). In Michigan, "in an action against the manufacturer of a product based upon an alleged defect in its design, breach of implied warranty and negligence involve identical evidence and require proof of exactly the same elements." *Prentis v. Yale Mfg. Co., supra,* 421 Mich. at 692, 365 N.W.2d 176; *Gawenda, supra,* 932 F.Supp. at 187. Thus, Plaintiff's inability to prove a design defect claim eviscerates her claim of breach of implied warranties, as well.

## CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and hereby is, GRANTED. Accordingly,

IT IS FURTHER ORDERED that this case be, and hereby is, DISMISSED in its entirety with prejudice.[11]

---

11. Having ordered that this case be dismissed in its entirety based on Plaintiff's lack of competent evidence to establish a *prima facie* claim of design defect or breach of implied warranties, it is unnecessary for the Court to address Defendant's additional partial summary judgment argument regarding Plaintiff's claim for non-economic damages. The Court's decision further renders MOOT Plaintiff's "Motion *In Limine* To Exclude Expert Testimony Regarding Future Economic Damages."