**In re NORTHWEST AIRLINES CORP., et al., ANTITRUST LITIGATION**

**This Document Relates to: All Actions.**

**No. 96–74711.**

United States District Court,
E.D. Michigan,
Southern Division.

March 29, 2002.

Bruce E. Gerstein, Barry S. Taus, Pending App., Noah J. Silverman, Pending App., Garwin, Bronzaft, New York, NY, Robert I. Harwood, Wechsler, Harwood, New York, NY, Elwood S. Simon, John P. Zuccarini, Elwood S. Simon Assoc., Birmingham, MI, Susan C. LaCava, Madison, WI, Patrick E. Cafferty, Miller, Faucher, Ann Arbor, MI, Donald L. Bramlage, Jr., Farmington Hills, MI, Marvin A. Miller, Miller, Faucher, Chicago, IL, Robert S. Palmer, Burt & Pucillo, West Palm Beach, FL, for Nelson Chase.

Bruce E. Gerstein, Barry S. Taus, Pending App., Noah J. Silverman, Pending App., Garwin, Bronzaft, New York, NY, Elwood S. Simon, John P. Zuccarini, Elwood S. Simon Assoc., Birmingham, MI, for Norman Volk, BLT Contracting, Inc.

Bruce E. Gerstein, Garwin, Bronzaft, New York, NY, Elwood S. Simon, Elwood S. Simon Assoc., Birmingham, MI, for Nitrogenous Industries, Corp.

Elwood S. Simon, John P. Zuccarini, Elwood S. Simon Assoc., Birmingham, MI, for Keystone Business Machines, Inc.

Parker C. Folse, III, Susman Godfrey, Seattle, WA, Lawrence G. Campbell, Kenneth J. McIntyre, Mary B. Kelly, Dickinson, Wright, Detroit, MI, James P. Denvir, Donald L. Flexner, Boies, Schiller, Washington, DC, for Northwest Airlines Corp., Northwest Airlines Inc.

Ian Simmons, O'Melveny & Myers, Washington, DC, James P. Denvir, Donald L. Flexner, Scott E. Gant, Boies, Schiller, Washington, DC, for U.S. Airways, Inc.

Alexander Anolik, San Francisco, CA, for Ass'n of Retail Travel Agents.

Morley Witus, Eugene Driker, Todd R. Mendel, Barris, Sott, Detroit, MI, for Continental Airlines, Inc.

Thomas J. Tallerico, Bodman, Longley, Troy, MI, for American Airlines, Inc.

David A. Ettinger, Honigman, Miller, Bingham Farms, MI, Emmet J. Bondurant, Bondurant, Mixson, Atlanta, GA, Howard B. Iwrey, Honigman, Miller, Detroit, MI, for Delta Air Lines, Inc.

Carl H. von Ende, Emily M.S. Houh, Miller, Canfield, Detroit, MI, Ian Simmons, O'Melveny & Myers, Washington, DC, James P. Denvir, Donald L. Flexner, Scott E. Gant, Boies, Schiller, Washington, DC, for U.S. Airways Group, Inc.

Kevin D. McDonald, Jones, Day, Washington, DC, J. Thomas Lenga, Clark Hill, Detroit, MI, Edwin L. Fountain, pending app., Jones, Day, Washington, DC, for Airlines Reporting Corp.

## *OPINION AND ORDER REGARDING DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' EXPERT TESTIMONY*

ROSEN, District Judge.

## I. *INTRODUCTION*

The Defendant Airlines (Northwest, U.S. Airways, and Delta, along with related entities) brought the present motion on November 15, 2000, requesting that this Court strike and exclude the proposed testimony of Plaintiffs' economic experts, Dr. John Beyer and Dr. Gary French, as failing to meet the admissibility standards set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).[1] On November 27, 2000, Defendant Airlines Reporting Corporation joined in this motion. Plaintiffs filed a brief in opposition to Defendants' motion on January 30, 2001, and Defendants filed a reply in further support of their motion on February 21, 2001. On March 1, 2001, the Court heard extensive testimony and the arguments of counsel on this matter. Each side then filed a supplemental brief shortly after the March 1 hearing.[2]

Defendants' motion challenges Dr. Beyer's report, proposed testimony, and theories on a number of points, each of which is separately addressed below. Broadly viewed, however, Defendants' motion rests upon two principal contentions: (i) that Dr. Beyer has adopted a result-driven approach at several key points in his analysis—including his determination of the relevant markets and his inquiry whether Defendants possess monopoly power in these markets—and, in so doing, has assumed away the very questions at issue, rather than resolving them through rigorous application of expert methodologies; and (ii) that his theories do not fit the facts of the case, or even attempt to account for

1. Defendants' motion focuses almost exclusively on the expert report and testimony of Dr. Beyer. Dr. French is an associate of Dr. Beyer, and offered his opinions when only Northwest was involved in this action. Because Dr. French and Dr. Beyer allegedly use the same approach in arriving at their conclusions, and because Dr. Beyer's later work summarizes and incorporates Dr. French's prior work, Defendants contend that Dr. French's earlier work should be excluded as suffering from many of the same defects as the later, more comprehensive work of Dr. Beyer. In light of this derivative challenge to Dr. French's testimony, the remainder of this Opinion addresses only the testimony of Dr. Beyer.

2. The Court ordered that these briefs not exceed 10 pages in length. However, on March 9, 2001, Plaintiffs filed a motion requesting the Court's permission to exceed this limit by three pages. Having reviewed Plaintiffs' motion and the expanded brief that accompanies it, the Court grants the motion, and agrees to accept Plaintiffs' lengthier brief for filing.

them. Plaintiffs, not surprisingly, dispute these contentions, arguing primarily (i) that Dr. Beyer's theories and conclusions derive from an appropriate combination of accepted methodology and reliable sources, and that he is not required to "reinvent the wheel" where, for example, government reports confirm certain key portions of the factual predicate necessary to conclude that Defendants possess monopoly power over the routes that originate or terminate in their respective "hub" airports; and (ii) that, while Defendants' experts might draw different conclusions from the evidentiary record, Dr. Beyer's conclusions sufficiently "fit" the facts to permit his testimony to be heard and weighed by the trier of fact.

Having reviewed the parties' written submissions on this matter and the record as a whole, and having considered the arguments of counsel at the March 1 hearing, the Court now is prepared to rule on Defendants' motion. This Opinion and Order sets forth the Court's ruling.

## II. *EXPERT TESTIMONY AT ISSUE*

Dr. John C. Beyer is the president of Nathan Associates, an economic and management consulting firm which provides economic research and analysis to a variety of public and private clients. Dr. Beyer has worked as an economist at this firm for 25 years, and has analyzed antitrust economic issues and offered expert testimony in antitrust suits on a number of occasions. Some of these prior suits have involved the airline industry, and Dr. Beyer states in his expert affidavit that he has "worked extensively on economic and financial issues in the airline industry and the broader civil air transportation industry." (Beyer 2/28/00 Aff. at ¶ 4.) Defendants do not take issue with Dr. Beyer's basic qualifications to offer expert economic testimony in this case.

Plaintiffs retained Dr. Beyer in the present action to analyze the economics behind, and the antitrust implications of, the "hidden-city ticketing" phenomenon which exists as a product of the Defendant Airlines' fare structures. Briefly stated, "hidden-city ticketing" is a practice through which a passenger seeks to obtain a lower fare for air travel between an airline's "hub" and "spoke" airports. For example, a passenger in New York City who wishes to fly to Detroit, a Northwest hub, might discover that Northwest's fare for air travel between two spoke airports, New York and Columbus, is actually lower than the fare for the passenger's desired travel between the New York spoke and the Detroit hub, even though the New York–to–Columbus "spoke-spoke" route actually passes through, and stops at, the Detroit hub. In this event, the passenger might reasonably elect to purchase the less expensive ticket for "spoke-spoke" travel between New York and Columbus, and then simply disembark at the desired destination of Detroit and discard the unused portion of the ticket. The Defendant Airlines, however, have developed various mechanisms to limit or altogether defeat this practice of "hidden-city ticketing." Plaintiffs allege that this prohibition forces passengers who travel to or from Defendants' hubs to pay monopolistic fares, and they further allege that Defendants and other non-parties have conspired among themselves to enforce these prohibitions in order to preserve their respective monopolies. *See generally Chase v. Northwest Airlines Corp.*, 49 F.Supp.2d 553, 555–59 (E.D.Mich.1999) (reviewing Plaintiffs' allegations in this suit).

Dr. Beyer's findings support these allegations.[3] Dr. Beyer's proposed expert testimony—as summarized in an affidavit dated February 28, 2000 and a supplemental

---

**3.** The Court notes, however, that Dr. Beyer does not opine whether Defendants and oth-

affidavit submitted on January 23, 2001 in response to Defendants' motion, and as confirmed by his testimony at his deposition and at the March 1 hearing—includes four components of particular significance to the present motion. First, he concludes that the relevant geographic markets in this case are the "city-pairs" spanned by the "spoke-hub" routes that originate or terminate at the seven hub airports maintained by the three Defendant Airlines. Dr. Beyer includes in his analysis each such spoke-hub route that is at least 150 miles in length, is traveled by at least 30,000 passengers per year, and is operated by a Defendant hub carrier with a 50% or greater market share, as measured by the mix of passengers traveling that route. Each of Dr. Beyer's "city-pairs" includes all routes from all airports in one metropolitan area to all airports in another. For example, Dr. Beyer's approach treats all flights to or from the Baltimore–Washington and Dulles airports as involving a single city, Washington D.C. Using this approach, Dr. Beyer has identified a total of 234 relevant "city pairs." He then defines the relevant product market as airline passenger service, reasoning that ground transportation is not a close substitute for air travel for distances greater than 150 miles.

Second, Dr. Beyer concludes that the Defendant Airlines possess monopoly power in these relevant markets. This conclusion rests principally upon two grounds. First, by hypothesis, the relevant markets are limited to those spoke-hub routes where a Defendant Airline has a 50% or greater market share. Next, Dr. Beyer examines various factors which, in his view, create barriers to entry that prevent or deter a potential entrant from compet-

ing in these markets. In particular, these markets all involve a Defendant's hub airport, and Dr. Beyer cites certain key factors, such as control of airport facilities and flight frequency dominance, that purportedly serve to insulate these hubs from competition. Dr. Beyer concludes that Defendants' market share, combined with the barriers to entry at their hubs, results in the Airlines' possession and exercise of monopoly power in their respective hub city-pair markets.

Third, Dr. Beyer turns to the specific issue of hidden-city ticketing. First, he notes the existence of many "hidden-city opportunities"—that is, instances where a passenger who wishes to travel a hub-spoke route can find at least *some* spoke-hub-spoke fare which is lower than the fare for the desired hub-spoke route, but which encompasses this desired route as one leg of the overall spoke-hub-spoke journey. From the existence of such opportunities, Dr. Beyer infers that Defendants are charging supra-competitive prices on their hub-spoke routes, thereby confirming his conclusion that Defendants possess monopoly power in the relevant markets.

Fourth, Dr. Beyer calculates the damages suffered by the members of the putative class. The benchmark for this calculation is the "hidden-city opportunities" described above. Dr. Beyer opines that, but for Defendants' prohibition on hidden-city ticketing, this practice would become widespread and would force the Airlines to lower their hub-spoke fares to the levels that could be achieved through this practice. Accordingly, Dr. Beyer uses the difference between Defendants' hub-spoke fares and the lower "hidden-city" fares to compute damages,[4] and he arrives at an

---

ers in fact engaged in a conspiracy to enforce their prohibitions on hidden-city ticketing, but only as to the economic and antitrust implications of such a conspiracy, assuming it exists.

4. To be accurate, Dr. Beyer employs a "minimum average" methodology in calculating the so-called "hub premiums" that the Airlines allegedly are imposing upon their hub-

aggregate figure in excess of $950 million for all of the Plaintiff classes and all three Defendant Airlines.

## III. *ANALYSIS*

### A. The Standards Governing Defendants' Motion

The parties largely agree on the standards that govern this Court's determination whether to exclude the proffered testimony of Plaintiffs' experts, Dr. Beyer and Dr. French.[5] As this Court recently observed, while "the evaluation of expert testimony is generally left to juries," the District Judge has the threshold obligation to "perform a gatekeeping function as to *all* proffered expert testimony." *Berry v. Crown Equip. Corp.*, 108 F.Supp.2d 743, 748 & n. 6 (E.D.Mich.2000). Yet, "the rejection of expert testimony is the exception rather than the rule," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Fed.R.Evid. 702, advisory committee notes, 2000 amendments (internal quotations and citation omitted). Through the present motion, Defendants urge the Court to invoke this gatekeeping authority to preclude any consideration of the opinions of Plaintiffs' experts, both in resolving the parties' pre-trial motions and in any eventual trial.

The starting point in the Court's analysis is Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

According to the advisory committee notes, the recent additions to this Rule were meant to respond to the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

The plain language of Rule 702 itself identifies several inquiries that must be undertaken in the Court's gatekeeping assessment of Plaintiffs' proffered testimony. First, the Court must determine whether the proposed witness possesses the requisite expertise, by reference to his "knowledge, skill, experience, training, or education." Fed.R.Evid. 702; *see also Berry*, 108 F.Supp.2d at 749. As noted above, this element of the Rule 702 inquiry is not at issue here, as Defendants do not challenge Dr. Beyer's basic qualifications to offer expert economic testimony.

Next, the witness's testimony must derive from "scientific, technical or other specialized knowledge." Fed.R.Evid. 702; *see also Berry*, 108 F.Supp.2d at 749. This prong of the inquiry tests the evidentiary reliability and trustworthiness of the proposed testimony. This analysis, in turn, has quantitative and qualitative components—the testimony must be "based upon

---

spoke passengers. The precise details of this methodology are not germane to the Court's present inquiry.

**5.** Unfortunately, the parties agreed on a somewhat outdated standard, failing to recognize in their initial submissions that the rele-

vant Federal Rules of Evidence were amended effective December 1, 2000, just a few days after Defendants filed their motion. The Court's invitation for the parties to file post-hearing supplemental briefs was intended in part to address this oversight.

sufficient facts or data," and also must rest upon a foundation of "reliable principles and methods." Fed.R.Evid. 702; *see also Berry,* 108 F.Supp.2d at 749. As to this latter question, the proper focus is upon the expert's methodology and principles, and not the conclusions he draws from their application; the Court need not be "concerned with the reliability of the conclusions generated by valid methods, principles and reasoning." *Greenwell v. Boatwright,* 184 F.3d 492, 497 (6th Cir.1999). The factors that the Court may consider in making this assessment include, but are not limited to, "the testability of the expert's hypotheses (whether they can be or have been tested), whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted in the [relevant] community." *Berry,* 108 F.Supp.2d at 749.

Finally, "in addition to requiring that a proposed expert's testimony be 'reliable,' Rule 702 requires that the expert's testimony assist the trier of fact." *Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir. 2000). *Daubert* and its progeny have interpreted this requirement as meaning that the proffered expert testimony must " 'fit' the facts of the case"—in other words, there must be a "connection between the . . . research or test result being offered and the disputed factual issues in the case in which the expert will testify." *Pride,* 218 F.3d at 578. As stated in the Rule itself, the witness must have "applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702.

In the specific context of antitrust actions, Rule 702 has been construed as dictating that an expert opinion account for and not "ignore[ ] inconvenient evidence," and that it "incorporate all aspects of the economic reality of the [relevant] market." *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1056–57 (8th Cir.2000). Moreover, expert testimony may not be "speculative," but must be reasonably grounded in the record. *Concord Boat,* 207 F.3d at 1057. "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." 207 F.3d at 1057 (internal quotations and citation omitted).

Throughout its inquiry, however, this Court must remain mindful of its limited gatekeeping role:

> Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. . . . These conventional devices, rather than wholesale exclusion . . ., are the appropriate safeguards where the basis of [expert] testimony meets the standards of Rule 702.

*Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798.[6]

## B. Dr. Beyer's Determination of the Relevant Markets

In the present motion, Defendants challenge five aspects of Dr. Beyer's proposed

---

**6.** In their briefs, the parties direct the Court's attention to prior cases in which Dr. Beyer's expert testimony was either rejected or cited with approval. *Compare, e.g., Blue Cross & Blue Shield United v. Marshfield Clinic,* 152 F.3d 588, 593 (7th Cir.1998) ("Beyer's two reports . . . are worthless."), *with In re Domestic Air Transp. Antitrust Litigation,* 137 F.R.D. 677, 686–87 (N.D.Ga.1991) (finding that Dr. Beyer was a "convincing and credible expert witness," and expressing "agree[ment]" with Dr. Beyer's analysis of the [airline] industry"). Plainly, however, the admissibility or exclusion of Dr. Beyer's expert testimony in other cases has no bearing whatsoever on the Court's inquiry in the present case.

expert testimony. First, Defendants contend that Dr. Beyer failed to perform any sort of rigorous, fact-specific analysis to arrive at the relevant markets to be considered in assessing Plaintiffs' antitrust claims on the merits. More specifically, Defendants challenge as arbitrary (i) Dr. Beyer's identification of "city-pairs" as the relevant geographic markets; (ii) his decision to treat all airports in a metropolitan area as a single "city" for purposes of his city-pair analysis, while placing airports in nearby cities in distinct markets; and (iii) his 150–mile cut-off for including a city-pair within the universe of relevant markets. According to Defendants, Dr. Beyer improperly based these decisions on allegedly "well known" general characteristics of the airline industry, (see Beyer Dep. at 405–06), and on government studies that did not themselves purport to make findings on these issues, rather than on his own independent and careful study of the particular facts and circumstances presented by each route encompassed within his definition of the "relevant markets." Defendants argue that Dr. Beyer's approach is inconsistent with the rigorous standards of antitrust law, under which the relevant product and geographic markets are defined by reference to such considerations as (i) whether there are substitute products that can perform the same function; (ii) consumer response to changes in price; and (iii) the area in which the seller operates, and within which the consumer can practicably turn to another supplier. See, e.g., White & White, Inc. v. American Hosp. Supply Corp., 723 F.2d 495, 500–01 (6th Cir.1983); Foundation for Interior Design Educ. Research v. Savannah Coll. of Art & Design, 73 F.Supp.2d 829, 837–38 (W.D.Mich.1999).

■ The Court finds that Dr. Beyer's testimony on this point, while perhaps somewhat lacking in analytical rigor, nonetheless survives scrutiny under the standards of Rule 702. Regarding Dr. Beyer's use of "city-pairs" as the relevant geographic markets in this case, Plaintiffs have produced a wealth of government reports, air travel data compilations, and statements by airline officials that use city-pairs as their frame of reference for discussing and evaluating various aspects of the air travel industry. As a practical matter, then, if for no other reason, Dr. Beyer seemingly would be justified in adopting a city-pair approach, as there otherwise would be very little available industry data upon which he could perform a market analysis. In addition, city-pairs seem to comport with the ordinary and natural understanding of consumers as they contemplate the purchase of this industry's product—namely, such a consumer typically would survey the options for travel between the desired origin and destination cities. This very point was made by an expert economist, Dr. Robert Pindyck, who was retained to testify on behalf of Defendant Northwest in its antitrust suit against American Airlines in the Southern District of Texas (the "Galveston Case").

■ Defendants' real quarrel, however, is with the purportedly "arbitrary" methods by which Dr. Beyer determined the set of city-pairs under consideration in this case. First, Defendants contend that a given city-pair could involve a greater travel distance than the 150–mile cut-off employed by Dr. Beyer, yet still present the possibility of product substitution. In cases where, for instance, superior forms of ground transportation provide a more viable alternative to air travel, an airline's hub dominance might not necessarily translate into the power to set artificially high prices, because travelers might opt to travel by ground rather than air. Similarly, as to Dr. Beyer's grouping of metropolitan airports into a single "city," differences among particular metropolitan areas—for

example, the sizes of the individual airports, and the distances between them—might undercut such a blanket approach, and lead to distinctions in the extent to which individual airports in these metropolitan areas compete among each other for the same pool of air travelers. Further, there might be instances where an airport does not lie within a metropolitan area, yet is sufficiently close by to affect the metropolitan area's market for air travel.

The Court is satisfied, at least for present purposes, that Dr. Beyer's testimony adequately addresses these criticisms. Regarding the 150–mile cut-off, Dr. Beyer testified that this was a screening device applied *after* he had first determined the set of hub-spoke city-pairs that are the relevant markets in this case. This 150–mile limit was determined by estimating the approximate minimum time involved in short-haul air travel—including travel to and from airports, emplaning and deplaning, airplane taxiing, and actual flying time, all of which total about 3 hours, according to Plaintiffs' experts—and then calculating roughly how far one could travel by ground transportation in the same amount of time. In Dr. Beyer's opinion, while city-pairs at distances of less than 150 miles might or might not produce a significant degree of air-ground substitution among travelers, the empirical analysis necessary to resolve this question would not be worth the cost and effort, and so it was decided to simply exclude them.

Defendants respond that Dr. Beyer's 150–mile cut-off is arbitrary, and that, in individual cases, ground transportation might be a viable substitute to air travel at greater distances, perhaps up to 300 miles. Defendants, however, have not identified a concrete example in support of this proposition. Rather, their expert's testimony on this point appears to be just as general as Dr. Beyer's. (*See* Ordover Dep. at 416–

19.) Moreover, the study they have produced, showing the prevalence of travel by car for round-trip distances of less than 1000 miles, sheds no light at all on the relevant question of substitution *between* ground and air transportation, nor is it confined to the business travel that is the principal focus of this case. Further, as Plaintiffs point out, to the extent that Defendants· and their experts have applied the same thought process that went into Dr. Beyer's adoption of a 150–mile cut-off, and have merely suggested that a higher or lower cut-off might be warranted in some cases, such a challenge to Dr. Beyer's conclusions does not cast doubt upon his underlying methodology.

More generally, Dr. Beyer has stated his view that, so far as he can tell, the airlines' pricing decisions are not influenced by the consideration whether ground transportation might serve as a substitute for air travel. (3/1/01 Hearing Tr. at 45, 48–49, 51–52.) Admittedly, Dr. Beyer was not able to identify any specific materials in the record that support this opinion. Yet, it is noteworthy that the Defendant Airlines have not produced anything to refute it. Although it is not Defendants' burden to disprove the reliability of Dr. Beyer's testimony, they surely are in a position to provide evidence as to the bases for their own pricing decisions, and thereby cast doubt on Dr. Beyer's views on the subject. At any rate, the Court's own review of the record has uncovered at least some evidence in support of Dr. Beyer's general opinion that the availability of ground transportation does not have a significant disciplining effect upon the price of air travel to and from hub airports. In particular, Plaintiffs have produced two reports by the U.S. Department of Transportation, one dated April of 1996 and the other January of 2001, stating that the "hub premiums" paid by hub-spoke airline passengers—that is, the amounts paid in

excess of what the fare would be for comparable travel not involving a hub airport—are higher on short-haul routes than on longer routes.[7]

Indeed, these reports illustrate the fundamental point of disagreement between the two sides in this case, and highlight the somewhat marginal significance of their debate as to the 150–mile limit. Plaintiffs contend, based in large part on Dr. Beyer's findings, that Defendants' position of dominance at their respective hubs enables them to charge allegedly anticompetitive fares for their hub-spoke routes.[8] In contrast, Defendants maintain that their hub-spoke fares, like all of their fares, are determined through myriad competitive and wholly legitimate considerations—including, for example, the need to consider whether travelers might substitute ground for air travel, particularly at shorter distances, if air fares are set too high. In between these two ends of the spectrum lie a whole host of possibilities—for instance, that Dr. Beyer's 150–mile limit unduly discounts the possibility of ground/air substitution for certain of the city-pairs he has included as relevant markets, but that this possibility of substitution plays only a minor role in Defendants' establishment of the fares for these routes. In this event, Dr. Beyer might still be correct in his overarching opinion that Defendants are charging anticompetitive fares on the hub-spoke markets at issue in this case, but he might be guilty of overestimating the extent of this anticompetitive effect, and underestimating the impact of legitimate considerations such as ground/

air substitution. Under these circumstances, the Court finds that Dr. Beyer's use of a 150–mile cut-off does not warrant the wholesale exclusion of his testimony, and that the trier of fact should decide whether Defendants have exposed enough weaknesses in this testimony to warrant its rejection, in full or in part.

■ Next, regarding Dr. Beyer's decision to group all airports within a metropolitan area as a single "city" in his city-pair analysis, while generally excluding airports that lie outside but near the metropolitan area, his affidavit cites a number of government reports, academic studies, and business documents of the Defendant Airlines that have similarly treated all metropolitan airports as a single endpoint of a city-pair market. (See Beyer 2/28/00 Aff. at ¶¶ 37–39.) This affidavit also addresses, and discounts, reports and studies that have used airport pairs rather than city-pairs as the basis for their analyses. (See id. at ¶ 37 n. 11, 40.) Dr. Beyer's affidavit further points out that few metropolitan areas have more than one large commercial airport, so that the choice between city-pairs and airport pairs would not affect most of the markets under consideration here. Finally, Dr. Beyer testified at the March 1 hearing that his decision not to include nearby airports—for example, the airport in Akron, Ohio, which is not far from Cleveland—as part of a single metropolitan "city" was based on a case-by-case analysis, under which he considered whether any airports within 40 or 50 miles of a metropolitan area had a

---

7. The 1996 report posits that this difference is attributable to the fact that a passenger traveling a longer hub-spoke route is more likely to consider the option of taking another airline's connecting spoke-hub-spoke route to achieve the same result, while such a connecting flight likely would not be considered as a reasonable alternative for short-distance travel.

8. Plaintiffs further assert, as discussed below, that Defendants' prohibition on hidden-city ticketing is one of the means through which the Airlines preserve their purported monopoly power at their hubs, and that the effect of this particular exercise of alleged monopoly power can be measured by examining the savings achievable through hidden-city ticketing.

sufficiently large volume of traffic to discipline the air fares at the metropolitan airports. (*See* 3/1/01 Hearing Tr. at 62, 65–69.)[9]

The Court finds that this record suffices to meet the threshold standard of admissibility under Rule 702. To be sure, Defendants have identified problems with Dr. Beyer's stated reliance on prior studies, reports, and airline documents, where these materials were not directed at the precise question at issue here—namely, whether nearby airports should be grouped together or treated separately for purposes of defining the relevant markets in antitrust litigation. For example, Dr. Beyer conceded at the March 1 hearing that he did not know why the Department of Transportation groups airports as it does for the purpose of data reporting. In addition, Defendants note that Dr. Beyer's airport groupings differ in some respects from those that appear in the materials on which he purportedly relies, yet the basis for these differences is largely absent from the record.

More generally, Defendants fault Dr. Beyer on this point, as on others, for failing to perform a detailed analysis on each of his proposed city-pairs to confirm, under the rigorous standards of antitrust law, that each airport has been appropriately grouped with all other airports, and only those airports, for which it has a

disciplining effect on fares. Here, at least, in contrast to their challenge to the 150–mile cut-off, Defendants have produced some concrete examples suggesting that Dr. Beyer's groupings may be incorrect.[10] As discussed earlier, however, the Court believes that the wholesale exclusion of Dr. Beyer's testimony would be an inappropriate remedy for this particular analytical weakness, where a flaw in this portion of Dr. Beyer's analysis would not ineluctably lead to the outright rejection of his larger conclusion—namely, that the fares on the city-pair routes he has identified reflect the exercise of monopoly power, even though other, legitimate considerations might also play a role in the determination of certain of these fares. It is enough, for present purposes, that Plaintiffs have supplied reasonable (though hardly unimpeachable) grounds for finding that Dr. Beyer's testimony on this point is reliable.

## C. Dr. Beyer's Use of Fifty–Percent Market Share in Concluding that Defendants Possess Monopoly Power over the Relevant Markets

■ Next, Defendants contend that Dr. Beyer's conclusions regarding Defendants' purported monopoly power rest upon the untenable assumption that such power exists wherever a Defendant enjoys a 50 percent or greater market share with respect to a given city-pair. As noted by

9. As noted at the March 1 hearing, Dr. Beyer has little to offer as proof that he performed such an analysis. He did note, however, that there was one tangible product of this analysis—specifically, his decision to treat the Baltimore/Washington airport as part of the Washington, D.C. metropolitan market, even though it does not lie within this metropolitan area.

10. Specifically, an affidavit provided by Mark A. Drusch of Delta Air Lines identifies some specific cases where the airports in a single metropolitan area—Los Angeles, for example—seemingly have been treated as distinct

for pricing purposes, and where airports in different metropolitan areas—Cincinnati and Dayton, for example—have been considered as competitive for pricing purposes. (*See* Drusch Decl. at ¶¶ 13–18.) The affidavits submitted on behalf of Northwest and U.S. Airways, however, are not nearly as informative on this issue. In addition, Dr. Beyer's most recent affidavit explains why, in his view, Defendants' fare comparisons do not necessarily bear upon the question whether passengers consider two nearby airports to be substitutes for each other. (*See* Beyer 1/23/01 Aff. at ¶ 19.)

Defendants, the courts generally have held that a 50 percent market share, standing alone, does not permit an inference of monopoly power, as this market share typically would be insufficient to permit a firm to control prices in the market over any significant period of time. *See, e.g., Blue Cross & Blue Shield United v. Marshfield Clinic,* 65 F.3d 1406, 1411 (7th Cir.1995) (observing that "[f]ifty percent is below any accepted benchmark for inferring monopoly power from market share," and citing several other cases for this proposition). Thus, Defendants contend that Dr. Beyer's alleged use of such a methodology here—a methodology which not only lacks widespread acceptance, but in fact has been widely rejected—renders his proposed expert testimony unreliable and inadmissible.

The Court finds no merit in this challenge. As Plaintiffs point out, it simply is not the case that Dr. Beyer inferred the existence of monopoly power based solely on a Defendant's 50 percent or greater share of a relevant market. Rather, Dr. Beyer states that this 50–percent figure is merely another screening device, applied *after* he had determined that a *combination* of dominant market share and barriers to entry at Defendants' hub airports has resulted in monopoly power in the relevant hub-spoke city-pair markets. In particular, even though a Defendant still might possess monopoly power in a city-pair market where its market share is below 50 percent, *see, e.g., Hayden Publ'g*

Co. v. Cox Broad. Corp., 730 F.2d 64, 69 n. 7 (2d Cir.1984) ("[A] party may have monopoly power in a particular market, even though its market share is less than 50%."), Dr. Beyer elected to exclude such markets from consideration, as a means of "streamlin[ing] the case" by eliminating marginal city-pairs in which monopoly power would be more difficult to prove. (Beyer 2/28/00 Aff. at ¶ 44 n. 26.)

Contrary to Defendants' assertion, then, Dr. Beyer does not rely upon a 50 percent or greater market share as conclusive proof of monopoly power, but rather as merely "consistent with the possession of monopoly power." (*Id.* at ¶ 45.)[11] Dr. Beyer submits that this underlying question, in turn, was addressed through a traditional market analysis, considering market share along with barriers to entry at Defendants' hub airports. Regarding this latter consideration, Dr. Beyer's report cites a number of factors—including control of airport facilities, flight frequency dominance, frequent flyer programs, travel agent commission overrides (or "TACOs"), and past predatory behavior—which have, in Dr. Beyer's view, together operated to erect substantial barriers to a potential competitor's entry into Defendants' hub city-pair markets. Plaintiffs also point to government and academic studies that likewise report the existence of barriers to entry at hub airports.

Defendants seemingly do not challenge Dr. Beyer's testimony on this point, but rather accuse Dr. Beyer of an undue leap

**11.** In fact, in the city-pairs examined by Dr. Beyer as relevant markets, he notes that "the defendants' [market] share is typically substantially above 50 percent." (*Id.* at ¶ 45.) Plaintiffs further observe that a 50–percent market share, standing alone, produces a Herfindahl–Hirschman Index ("HHI") of 2500 for such a market, which is considered under the Department of Justice Merger Guidelines to be a "highly concentrated" market.

As an aside, the parties and their experts agree that the HHI is a widely used measure of market concentration. The HHI is the sum of the squared market shares of all firms in the market. Thus, in a market divided equally between two firms, the HHI would be $(50)^2 + (50)^2 = 2500 + 2500 = 5000$, and a market entirely dominated by a single firm would produce an HHI of $(100)^2 = 10,000$.

in logic, as he moves from general observations about barriers to entry at hubs to the broad conclusion that Defendants possess monopoly power on each and every route to or from those hubs for which they hold a 50 percent or greater market share. The Airlines argue that this generalized approach is at odds with the governing precedents, which caution that "[o]nly a careful factual analysis of the market in question will reveal whether monopoly power, in fact, exists." *Byars v. Bluff City News Co.,* 609 F.2d 843, 851 (6th Cir.1979) (footnote omitted). It could be the case, for example, that the specific characteristics of one hub-spoke market make an airline particularly vulnerable to competitive challenge on this route, notwithstanding its general position of dominance at the hub. Defendants further contend that Dr. Beyer's conclusions fail to account for those instances in which there have been new, at least somewhat sustained airline entrants into the hubs at issue here.

Though these criticisms are by no means unfounded, the Court concludes that there is sufficient support in the record to permit Dr. Beyer to offer his somewhat "hub-skewed" analysis of the Defendant Airlines' practices in this case. First, the record reflects that Dr. Beyer is not alone in his view of the Airlines' dominance at their hubs, and of the effect of this dominance. Specifically, Plaintiffs have produced various materials—including, for example, recent reports and findings by the U.S. Department of Transportation ("DOT"), and an academic study by Clinton V. Oster, Jr. and John S. Strong—which echo many aspects of Dr. Beyer's opinion in this case. A January, 2001 DOT report entitled "Dominated Hub Fares," for instance, includes the finding that "[i]n dominated hubs as a whole, 24.7 million passengers pay on average 41% more than do their counterparts flying in hub markets with low-fare competition." U.S. Department of Transportation, Dominated

Hub Fares 1 (2001). This report further determines that four of the hubs at issue in this case—Charlotte, Cincinnati, Minneapolis, and Pittsburgh—"have the highest overall fare differentials," a determination that the DOT characterizes as "consistent with findings in past studies, in spite of differing methodology." (*Id.* at 2.) The DOT concludes that "the lack of price competition," rather than the rationales commonly offered by the airlines, is the root cause of "high prices at hub markets." (*Id.*) In light of this record, then, it cannot be said that Dr. Beyer's opinion is so novel or controversial that its reliability is inherently suspect.

In addition, Dr. Beyer's testimony at the March 1 hearing somewhat (albeit not entirely) refuted Defendants' contention that he did not perform the necessary route-by-route analysis of the Airlines' market power. Dr. Beyer testified that, for each of the 234 relevant markets in this case, he reviewed DOT origin/destination data to determine the identities and sizes of Defendants' competitors, the lengths of time these competitors were present in the market, and the likelihood that they could sustain this presence and affect pricing, in light of his conclusion that there were barriers to entry at each of the seven hubs at issue here. (*See* 3/1/01 Hearing Tr. at 114–18.) Dr. Beyer also cited a specific instance—Vanguard Airlines at the Minneapolis/St. Paul airport—where a competitor had made a sustained entry at a hub, but had attained too small a share of passengers to affect prices, as well as a counter-example—Southwest Airlines at the Salt Lake City airport, a Delta hub not at issue in this case—where a low-fare entrant had produced a reduction in fares. (*See id.* at 90–91.)

Admittedly, Dr. Beyer conceded that this market analysis was not committed to writing, but was performed entirely "in my

head." (*See id.* at 117–18.) Defendants complain, somewhat justifiably, that this Court's "gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed.R.Evid. 702, advisory committee notes, 2000 amendments (citation omitted). The Court believes, however, that this weakness is best explored during cross-examination at trial, when Defendants will have an opportunity to confront Dr. Beyer with specific counter-examples suggesting that his analysis is flawed. Because the present record lacks such counter-examples, the Court declines to exclude Dr. Beyer's testimony on the mere possibility that it contains flaws of sufficient weight to wholly undermine its reliability.

### D. Dr. Beyer's Reliance on "Hidden–City Opportunities" to Confirm the Existence of Monopoly Power

Defendants next assert that Dr. Beyer inappropriately infers the existence of monopoly power from the fact that certain spoke-spoke fares reflect so-called "hidden-city opportunities"—that is, instances where, but for Defendants' prohibitions, a passenger who wished to travel a hub-spoke route could save money by purchasing a less expensive "hidden-city" spoke-hub-spoke ticket and discarding the unused portion of the ticket. Initially, Plaintiffs correctly point out that this argument once again mischaracterizes Dr. Beyer's proposed testimony. He has not, in fact, based his findings of monopoly power on these "hidden-city opportunities," but has merely stated that these fare anomalies *confirm* his findings as to monopoly power.

Nonetheless, Defendants argue that such "hidden-city opportunities" do not even serve this limited purpose, but, to the contrary, tend to undermine Dr. Beyer's suggested link between market share and monopoly power. In particular, Defendants point to data compiled by their experts which reflect that many spoke-spoke routes are more highly concentrated—that is, one airline holds a more dominant share of the passenger load—than their constituent hub-spoke routes. This data further indicates that hidden-city opportunities exist even on some of these concentrated spoke-spoke routes, and that the savings from these "opportunities" are occasionally higher despite the greater market share dominance on these routes. These findings, in Defendants' view, undercut Dr. Beyer's theory that lack of competition at hubs produces higher, supra-competitive prices on hub-spoke routes, while greater competition in spoke-spoke markets often produces lower fares (and, therefore, hidden-city opportunities). More generally, Defendants note that the spoke-spoke routes that do *not* generate hidden-city savings greatly outnumber those that do. In short, Defendants assert that hidden-city opportunities simply fail to correlate in any meaningful way with greater competition in spoke-spoke markets.

In response, Plaintiffs contend that Defendants and their experts are guilty of the same oversimplified analysis that they have accused Dr. Beyer of conducting. Specifically, as Defendants themselves point out, market share alone does not establish an anticompetitive market, but must be accompanied by other conditions such as barriers to entry. According to Dr. Beyer, such barriers do not exist at most "spoke" airports to anywhere near the degree that they exist at Defendants' "hub" airports. Thus, even where one airline enjoys a dominant market share on a particular spoke-spoke route, it cannot confidently raise the fare on this route to a supra-competitive level, because another airline could readily enter this market and capture a portion of passenger business by setting a lower fare. Consequently, Plaintiffs and their expert argue that Defendants have engaged in a meaningless "apples-to-oranges" comparison by looking to the respective market shares and concen-

trations on spoke-spoke and hub-spoke routes.

Viewed from this perspective, it is clear that this dispute over the significance of "hidden-city opportunities" is just another example of the parties' sharply divergent views as to whether the Defendant Airlines have leveraged barriers to entry and market share at their hub airports into the power to set artificially high fares for flights into or out of these hubs. As discussed earlier, the Court is satisfied that the opinion of Plaintiffs' expert on this point is sufficiently reliable to warrant its presentation to the trier of fact, particularly where it appears that Dr. Beyer's hub-based analytical approach enjoys widespread support in the literature that Plaintiffs have placed into the record.

### E. Dr. Beyer's Use of Hidden–City Routes as Benchmarks for Determining Whether Defendants Have Exercised Monopoly Power to Establish Supra–Competitive Hub–Spoke Fares

■ Apart from pointing to hidden-city opportunities as confirmation of his findings as to monopoly power, Dr. Beyer uses these same fare discrepancies as benchmarks for determining whether Defendants have engaged in monopolistic pricing in the relevant hub-spoke markets. In particular, Dr. Beyer notes that "hidden-city fares provide the same air service as the hub-spoke fares" for those passengers interested in hub-spoke travel, (Beyer 2/28/00 Aff. at ¶ 18), and he reasons that "since the hidden-city fares are prices that consumers would have paid absent the defendants' [prohibition on hidden-city tick-

eting], the hidden-city fares are good measures for what competitive fares would be in hub-spoke markets," (*id.* at ¶ 78).

As the next issue in support of their motion, Defendants argue that this aspect of Dr. Beyer's analysis is fatally flawed. Defendants note that, under antitrust law, a benchmark must be sufficiently comparable to the market under consideration to permit the conclusion that price differences are the product of antitrust violations, and not other factors. *See Home Placement Serv., Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1206–07 (1st Cir. 1987). One court has observed that the "failure to keep 'other things equal' is one of the known 'pitfalls . . . in the path of the serious economist.'" *In re Aluminum Phosphide Antitrust Litigation*, 893 F.Supp. 1497, 1503 (D.Kan.1995) (citation omitted).

Defendants assert that Dr. Beyer's report suffers from this defect, as it compares connecting service to one city (the spoke-spoke destination) with nonstop service to a different city (the hub-spoke destination which lies along the spoke-spoke route). Defendants point out that a number of factors might explain differences in fares between spoke-spoke and hub-spoke routes, including: (i) different consumer demand, with routes originating or ending in a hub typically in greater demand than routes involving an outlying spoke city;[12] (ii) the greater desirability of direct service, versus the connecting service offered when traveling between spokes; and (iii) the circuitous routings or long "backhauls" required under some of the spoke-spoke routes cited by Dr. Beyer as benchmarks.[13] Indeed, Defendants note that

---

12. In fact, Defendants point out that some of the hidden-city routes used by Dr. Beyer as benchmarks had little or no traffic during some of the time periods covered in his analysis.

13. A "back-haul" exists whenever a route "flies past" the final destination as it connects at a hub. For example, a spoke-spoke route between Albany, New York and Richmond, Virginia that passes through a hub in Atlanta would include a "back-haul," since Atlanta is

the existence of such differentiating factors is clear from the fact, as demonstrated in the record, that only some, and by no means all, of the available spoke-spoke routes produce hidden-city opportunities for savings on the underlying hub-spoke routes, while many others are priced higher than the constituent hub-spoke routes. In light of these factors, which Dr. Beyer's analysis largely ignores, Defendants contend that there is a poor "fit" between the factual record and Dr. Beyer's determination that hidden-city spoke-spoke fares provide an appropriate benchmark for demonstrating that fares on the constituent hub-spoke routes are artificially high.

Plaintiffs respond that the hidden-city fares are not only sufficiently comparable to permit meaningful evaluation of their antitrust claims, but that a hidden-city ticket and a hub-spoke ticket provide *precisely* the same product, from the vantage point of a member of the putative Plaintiff class who wishes only to travel between the hub and the spoke. Stated differently, a hidden-city spoke-spoke ticket is simply a discount ticket for the traveler who wishes to fly between the spoke and hub cities. Because the consumer receives exactly the same product and services through either Dr. Beyer's hidden-city benchmarks or conventional hub-spoke tickets, Plaintiffs argue that their expert's benchmarks fully satisfy the antitrust requirement of comparability.

Moreover, Plaintiffs contend that the validity of these benchmarks is in no way undermined by the existence of spoke-spoke routes and fares that do not produce

hidden-city opportunities for savings. In his supplemental affidavit, Dr. Beyer opines that such cases of "negative" hidden-city savings are likely attributable to such factors as natural monopolies on certain spoke-spoke routes and the overall distances of the various spoke-spoke routes. (*See* Beyer 1/23/01 Aff. at ¶¶ 36–44.) [14] In any event, Plaintiffs argue that it is irrelevant whether some spoke-spoke routes fail to produce hidden-city opportunities for savings. So long as there are enough lower-fare spoke-spoke routes—or, as Dr. Beyer's theory would hold, "competitive" spoke-spoke routes—to produce opportunities for passengers to achieve these hidden-city savings on hub-spoke travel, it does not matter whether other spoke-spoke routes through the same hub fail to offer such opportunities.

Upon considering the parties' arguments, the Court again finds itself confronted with two somewhat extreme and mutually exclusive explanations of the hidden-city savings phenomenon. That the parties would reach such diametrically opposed conclusions is not particularly surprising, given that they begin their respective analyses from two entirely different vantage points. From Plaintiffs' perspective, that of a consumer, the hidden-city and hub-spoke tickets are precisely equivalent, as they both permit travel along the same desired hub-spoke route. Yet, from Defendants' perspective as airlines making pricing decisions, two different sets of considerations necessarily go into the determination of prices for two different routes, even if one route (for spoke-spoke travel)

south of Richmond. More generally, the parties' submissions speak of "circuity," which is a measure of the degree to which passengers are routed out of their way as they travel between spokes via a connecting hub.

14. As to this latter point, Dr. Beyer notes that Defendants' spoke-spoke fares generally, though not precisely, correlate with the dis-

tance between origin and destination. (*See id.* at ¶ 41.) He reasons, therefore, that spoke-spoke routes that involve longer distances between the hub and the final spoke destination are less likely to yield hidden-city savings, because cost factors tend to dominate over other considerations as the travel distance increases. (*See id.* at ¶ 42.)

might include another route (for hub-spoke travel) as one of its segments. Defendants point out, and Plaintiffs cannot contest, that these pricing decisions currently are made in a world in which hidden-city ticketing is prohibited, so that an airline may freely set its prices without considering whether its fare structure produces hidden-city pricing anomalies. Defendants are surely correct in stating that Plaintiffs must address this pricing perspective in order to sustain their antitrust claims—it is the Airlines' conduct, after all, that is being challenged in this case—and that Dr. Beyer is not free to dismiss out of hand the possibility that hidden-city savings opportunities exist as a lawful byproduct of appropriate pricing considerations, as opposed to evidencing the unlawful exercise of monopoly power.

In the end, however, Defendants' challenge to Dr. Beyer's benchmark analysis does no more than to highlight the point—admittedly, an important one—that this analysis rests on a number of antecedent opinions, each of which must be credited, at least to some extent, in order to accept his proposed comparison between hub-spoke and hidden-city fares. As an obvious example, if the trier of fact does not accept Dr. Beyer's opinion that the Airlines hold monopoly power in the relevant hub-spoke markets, then any "hub premiums" or hidden-city savings opportunities cannot have resulted from the exercise of a power the Airlines do not possess, and the hidden-city fare anomaly must have a lawful explanation. Yet, the interdependent nature of Dr. Beyer's testimony, standing alone, is not a ground for its exclusion. Rather, this interdependency merely illustrates the difficulties of proof that Plaintiffs must confront in this action, where an adverse determination at any one of a number of points will defeat their overall case.

Neither is it appropriate to evaluate the reliability of Dr. Beyer's benchmark analysis in isolation, without reference to the opinions on which it rests. In particular, as discussed earlier, it is not necessary to consider whether hidden-city fares alone may serve as reliable evidence of Defendants' alleged monopoly power, where Dr. Beyer points to these fares as confirmation of his separate conclusion as to the existence of such power. If these fares may properly serve this confirmatory purpose—and the Court already has held that Dr. Beyer's opinion on this point survives gatekeeping scrutiny under Rule 702—it can only be because they arguably reflect anticompetitive hub premiums that give rise to the existence of hidden-city savings opportunities. Any other explanation would defeat *both* Dr. Beyer's benchmark analysis *and* his reliance on hidden-city fares to confirm Defendants' alleged monopoly power in the relevant hub-spoke markets—these two opinions go hand in hand, and neither can survive independent of the other.

More generally, the Court must be mindful of the overall mission here—namely, to ascertain the motives, lawful or unlawful, behind Defendants' pricing decisions in the relevant hub-spoke markets. Absent "smoking gun" evidence of monopolistic intent—and none appears in the present record—Plaintiffs necessarily must prove their case circumstantially, by showing that Defendants' hub-spoke fares more likely than not include an anticompetitive hub premium. In support of this proposition, Plaintiffs offer the testimony of Dr. Beyer, who has opined that Defendants possess monopoly power in the relevant hub-spoke markets, and that hidden-city savings opportunities are a product of the exercise of this power to establish artificially high hub-spoke fares.

Not surprisingly, Defendants take issue with both of these points, and, as to the latter, they offer evidence of lawful explanations for their fare structures. Assuming that the former, foundational portions of Dr. Beyer's testimony satisfy the Court's threshold inquiry under Rule 702—and the Court already has found that they do—it appears to be quintessentially the role of the trier of fact to determine the motives of the Airlines by weighing the examples and counter-examples offered by the parties in support of their respective positions. This is particularly so where, as discussed below, it is entirely possible that the truth, as determined by the trier of fact, could lie somewhere between these two positions. At this point, it is enough to conclude that the counter-examples offered by Defendants to date—*e.g.*, the prevalence of hidden-city fares that exceed the underlying hub-spoke fares, or the fact that many spoke-spoke markets are more concentrated than the allegedly "monopolized" hub-spoke markets at issue here—merely weaken Dr. Beyer's testimony, but do not fatally undermine it.

**F. Dr. Beyer's Calculation of Damages by Averaging the Savings on the Spoke–Spoke Routes that Provide "Hidden–City Opportunities," While Excluding Those Routes Which Would Produce Zero or Negative Damages**

■ In calculating the damages suffered by the members of the putative class, Dr. Beyer again applies his benchmark of only those spoke-spoke routes that produce savings over the underlying hub-spoke routes, while ignoring instances of zero or "negative" savings where the spoke-spoke fare exceeds the underlying hub-spoke fare.[15] Defendants argue that this approach is biased and unsupported by any valid economic methodology, as it necessarily results in a positive damage award so long as there is *any* hidden-city opportunity among *any* of the spoke-spoke routes that include the passenger's desired hub-spoke segment. Defendants further assert that Dr. Beyer's damage calculations are based on the purely speculative theory, not derived from objective evidence or careful analysis, that such hidden-city fares serve as evidence of the Defendant Airlines' likely hub-spoke pricing scheme in the "but-for" world where hidden-city ticketing is no longer prohibited. Defendants contend that Dr. Beyer's analysis fails to account for the Airlines' other possible responses—*e.g.*, raising hidden-city fares to eliminate savings opportunities, eliminating hidden-city routes, re-routing hidden-city routes through different hubs, or simply tolerating some level of hidden-city ticketing without lowering hub-spoke fares—in the event that they could no longer preclude the practice of hidden-city ticketing. While Defendants raise a number of valid concerns, and although the question is a close one, the Court concludes that Dr. Beyer's damage calculations pass muster under Rule 702.

It is important, at the outset, to recall the context in which Dr. Beyer's damage

---

**15.** More precisely, and as alluded to earlier, Dr. Beyer used "minimum averaging" to calculate damages. Under this approach, for each hub-spoke market, Dr. Beyer computed the average hidden-city savings percentage for each fare code on a quarterly basis. Dr. Beyer then chose the fare code that achieved the smallest average savings percentage as his benchmark for the alleged anticompetitive overcharge for that quarter. For example, upon reviewing the Albany–Atlanta market on the date of September 19, 1995, Dr. Beyer found that the average savings percentages under the six applicable fare codes ranged from 11.5 to 14 percent. He used the smallest of these averages—11.5 percent—as the alleged overcharge imposed by Defendant Delta on its passengers traveling between Albany and Atlanta during this quarter in 1995.

calculations would be presented to the trier of fact. Specifically, the putative Plaintiff class would have suffered no injury at all, and Dr. Beyer's assessment of damages would be wholly irrelevant, unless it were determined (i) that the Defendant Airlines do possess monopoly power in the relevant hub-spoke markets; (ii) that they have exercised this power to impose artificially high fares upon passengers traveling on these hub-spoke routes; and (iii) that their hidden-city ticket prohibitions are a means by which they have preserved these anticompetitive fares. Thus, the admissibility of Dr. Beyer's damage calculations must turn solely upon the question whether they offer a reliable and useful measure of the extent of the injuries allegedly suffered by the putative class as a result of Defendants' allegedly unlawful conduct, and not upon considerations of the quality of Plaintiffs' proofs as to whether Defendants have engaged in such conduct or whether such injuries actually have been sustained. In addition, the Court must be mindful of the principle that a wrongdoer is in a poor position to "insist upon specific and certain proof of the injury which it has itself inflicted," and must also recognize that, in cases like this one, "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981).

With this background in mind, the Court readily acknowledges that Dr. Beyer's assessment of damages is vulnerable to attack on a number of the grounds identified by Defendants. To be sure, his analysis has the virtue of simplicity. If a hidden-city saving opportunity existed on a hub-spoke route that a member of the Plaintiff class wished to travel, and if the Defendant Airlines were forbidden to enforce their current prohibitions against hidden-city ticketing, it is reasonable to assume that this class member would purchase a hidden-city ticket, and would thereby save the difference between the standard hub-spoke and discounted hidden-city fares. It appears superficially plausible, therefore, that hidden-city fares would serve as an appropriate measure of the injuries allegedly suffered by the putative class members as a result of Defendants' hidden-city prohibitions. It also follows, under this analysis, that any instances of "negative" hidden-city savings—that is, cases where the spoke-spoke fare exceeds the constituent hub-spoke fare—are irrelevant to the determination of damages and may be disregarded, since a class member plainly would not purchase such a "negative savings" hidden-city ticket in lieu of a less expensive hub-spoke ticket.

This simplified view, however, overlooks any consideration of what Defendants might do in this "but-for" world in which they could not enforce their current prohibitions against hidden-city ticketing. Moreover, the parties are in rare agreement on this point—in particular, all are agreed that the Airlines would take *some* sort of action in response if they were no longer permitted to enforce their existing prohibitions. The determinative issue before the Court, then, is whether Dr. Beyer's damage analysis properly accounts for or impermissibly discounts this additional consideration of Defendants' possible responses in the "but-for" world where the practice of hidden-city ticketing is allowed.

Initially, the Court observes that Dr. Beyer cannot legitimately be accused of wholly failing to consider how Defendants might respond if they could not prohibit this practice. To the contrary, he has expressly addressed this issue, and has offered an opinion on the subject. In Dr. Beyer's view, "without the prohibitions, hidden-city ticketing would have become

so prevalent that [the Airlines] would have lost their ability to maintain monopoly power and probably would have simply lowered fares for hub-spoke service." (Beyer 2/28/00 Aff. at ¶ 109.) His supplemental affidavit explains this opinion in greater detail, seeks to rebut Defendants' arguments as to their other possible responses,[16] and includes an example—Delta's Albany–Atlanta market in the third quarter of 1997—as illustrative of his conclusion that the Airlines' "rational and profit-maximizing option" would be to lower their hub-spoke fares (Beyer 1/23/01 Aff. at ¶¶ 61–75.)

Plainly, to the extent that Defendants and their experts have applied a similar methodology and merely reached a different conclusion, such a "battle of the experts" must be resolved by the trier of fact. This is particularly so where, as noted, the relevance of the inquiry into Defendants' likely conduct in the "but-for" world turns upon the antecedent determination whether their hidden-city prohibitions are unlawful; if so, Defendants should bear the risk of any inherent uncertainty about their conduct in the absence of this unlawful prohibition. And again, the Court cannot say that Defendants have presented such weighty counter-examples or counter-theories of their conduct in the "but-for" world as to render Dr. Beyer's opinion wholly inadmissible on this point. The Airlines' mere recitation of possible alternative responses does not suffice, where Dr. Beyer has offered reasoned grounds for deeming these alternatives unlikely to occur.[17]

Nevertheless, before Dr. Beyer's theory of damages may be presented to the trier of fact, it must offer at least a plausible measure of the injuries allegedly suffered by the members of the putative class, and it is here that Plaintiffs confront a significant obstacle. To see why, it is necessary to recall the nature of the injury allegedly suffered by the members of the putative class—specifically, the payment of artificially high fares, or "hub premiums," for travel to or from Defendants' hub airports. As noted, Dr. Beyer has opined that the Defendant Airlines would no longer be able to charge these hub premiums if they could not enforce their current prohibitions against hidden-city ticketing. A theory of damages in this case, therefore, must provide a plausible measure of the hub premiums paid by the putative class members over the years.

Simply stated, and as Defendants argue, it is not immediately obvious why lower-cost hidden-city fares in the current world, with its hidden-city prohibitions, should provide a reasonable estimate of hub-

---

**16.** For instance, as to Defendants' contention that they might choose to raise their spoke-spoke fares rather than lowering their hub-spoke fares, Dr. Beyer opines that this is unlikely, where competitive concerns and reduced barriers to entry would militate against fare increases on the spoke-spoke routes.

**17.** Moreover, on this point, as on others, the Court questions Defendants' apparent premise that Dr. Beyer's opinion must be accepted in total in order to sustain an award of damages. In particular, Defendants seem to suggest that any variance in their market-by-market responses in the "but-for" world would fatally undermine Dr. Beyer's theory of damages. The Court fails to see why this is

so. It is common in civil litigation for plaintiffs to offer a "worst-case scenario" theory of damages, and for defendants to respond that, even if a wrong was committed, the plaintiffs suffered no damages. The trier of fact generally is then free to award damages within the range established by the parties' proofs. The situation is no different here, where Dr. Beyer has opined that, in the absence of hidden-city prohibitions, the plaintiff class would have captured much of the savings reflected in the Airlines' present-day hidden-city fares, and where Defendants respond that they might well have chosen to adopt a course of conduct—e.g., raising their fares on the spoke-spoke hidden-city routes—that would have eliminated any such savings opportunities.

spoke fares in the "but-for" world, where hidden-city ticketing is permitted. Dr. Beyer has testified that competitive concerns play an influential role in the Airlines' determination of the former, hidden-city fares. Similarly, he has opined that, in the absence of hidden-city prohibitions, the Airlines' hub-spoke fares also would be subject to the forces of competition. If this is so, however, it is difficult to see how a present-day competitive fare on a spoke-hub-spoke route could serve as a good measure of the likely (and presumptively competitive) fare on the constituent hub-spoke route in the "but-for" world where hidden-city ticketing is permitted. To take a concrete example, Dr. Beyer's theory of damages proposes to use the current New York–Columbus fare through the Detroit hub in calculating the likely "but-for" fare for travel from New York to Detroit. Yet, these two markets, New York–Columbus and New York–Detroit, obviously present two different sets of competitive considerations. Nor is the situation necessarily made better through Dr. Beyer's use of averaging, since an average of seemingly incomparable fares offers no improvement over a single such fare.

Indeed, Dr. Beyer seemingly acknowledged this difficulty, albeit indirectly, in his testimony at the March 1 hearing. He agreed, for example, that no single hidden-city fare, by itself, would serve as a good benchmark for the alleged anticompetitive injury in this case, (*see* 3/1/01 Hearing Tr. at 137); yet, as noted, it is not clear why several such fares averaged together would be a more accurate measure. Dr. Beyer further acknowledged that hidden-city fares differ among themselves because of factors such as competition, cost, and demand, (*see id.* at 135); but again, it presumably follows that these fares *also*, and for the same reasons, would differ from—and hence, would be of limited use in estimating—the Airlines' hub-spoke fare in the "but-for" world.

More generally, and along the same lines, Dr. Beyer testified that he deemed it "irrelevant" to his analysis to consider why a given hidden-city savings opportunity exists. (*Id.* at 161.) Such savings can serve as a useful measure of injury, however, only to the extent that they accurately reflect pricing differences for the same products in competitive and anticompetitive markets. It surely is important, then, to ascertain that anticompetitive forces have played some part in the availability and extent of hidden-city savings opportunities. Indeed, Dr. Beyer's testimony is somewhat inconsistent on this point, as he elsewhere stated that the goal of his damage analysis was to determine the portion of the Airlines' "hub premiums" that is attributable to their prohibitions against hidden-city ticketing. If hidden-city fares are relevant to this analysis, it can only be because they provide a measure of what the Airlines' hub-spoke fares would be if their allegedly unlawful hidden-city prohibitions were removed. And this, in turn, can only be true to the extent that these hidden-city fares have been shaped by forces comparable to those that would remain in effect in the hub-spoke markets absent the current hidden-city prohibitions. In short, it plainly *is* relevant to ensure that hidden-city savings opportunities exist, at least in part, because of competitive considerations.

The question becomes whether these concerns and apparent inconsistencies render Dr. Beyer's theory of damages wholly inadmissible, or whether they merely serve as fodder for Defendants' vigorous cross-examination at trial. The Court concludes the latter, for two reasons. First, despite the Court's considerable skepticism as· to Dr. Beyer's claim that hidden-city and hub-spoke tickets offer "[e]xactly the same product" for purposes of the damage analysis in this case, (*id.* at 119), it does appear that these two products have at least

enough similarities to permit a degree of reliable comparison. For instance, to the extent that air fares reflect considerations of cost and distance, a hidden-city fare should equal or exceed the fare on a constituent hub-spoke route, and thus would serve as a conservative estimate of a competitive hub-spoke fare. In addition, because the hidden-city and hub-spoke routes share one endpoint, the competitive forces at this end of the two markets are somewhat comparable. Markets need not be wholly identical to serve useful and reliable purposes in an antitrust analysis—and, as noted earlier, the courts have observed that certainty generally is unattainable in determining what a market would do in the absence of an antitrust violation.

Indeed, the Court has searched the record in vain for any better means of estimating the alleged damages in this case. Admittedly, it is not Defendants' burden to identify such means. Nonetheless, the Court finds it noteworthy that, to the extent that Defendants appear to offer suggestions for "improving" Dr. Beyer's analysis, these suggestions arguably make matters worse. In particular, while Defendants fault Dr. Beyer for excluding certain hidden-city routes—*i.e.*, those that generate so-called "negative" savings opportunities, because the hidden-city fare is higher than the constituent hub-spoke fare—from his damage calculations, the Court finds ample plausible grounds for doing so. As noted earlier, Dr. Beyer has provided some reasons for these exclusions—*e.g.*, that some of these routes present natural monopolies where prices tend to be higher, and that others involve far greater distances, and hence higher fares, than the constituent hub-spoke routes.

Further, while Defendants complain that these exclusions ensure positive damages, there is absolutely *no* evidence in the record, and no reason to believe, that hub-spoke fares would *increase* in the absence of hidden-city ticket prohibitions, thereby leaving Plaintiffs' worse off for their efforts to remove these prohibitions. Even Defendants themselves posit only that Plaintiffs might be no better off, because the Airlines might choose not to *lower* their hub-spoke fares. Thus, the Court fails to see how the instances of "negative" hidden-city savings opportunities could have any bearing whatsoever on a reasonable estimate of hub-spoke fares in the "but-for" world.[18]

Next, as observed earlier, the parties uniformly agree that the Airlines would do *something* in response if they could no longer enforce their hidden-city prohibitions. There also is some evidence in the record which suggests that the Airlines would be unlikely to tolerate any significant degree of hidden-city ticketing, presumably because it leads to empty seats that could be sold to other passengers. While there are myriad views among the parties and their experts as to precisely *what* response the Airlines might choose, the Court noted above that Dr. Beyer has offered a plausible economic account in support of his opinion that the Airlines' most likely response would be to lower their hub-spoke fares to eliminate possible hidden-city savings opportunities.

Accepting, for the moment, that Dr. Beyer has accurately predicted Defendants' course of action, the Airlines' current hidden-city fares *do* serve as a reasonable estimate of what their hub-spoke

---

18. In fact, there is a degree of inconsistency in Defendants' complaint on this score. They generally assert that hidden-city fares, whether they reflect "positive" or "negative" savings opportunities, have nothing at all to say about what hub-spoke fares would be in the "but-for" world. Seemingly, then, this defect is not cured by the inclusion of *more* hidden-city fares in the calculation.

fares would be if they could no longer enforce their hidden-city prohibitions. In order to curtail the practice of hidden-city ticketing, the Airlines necessarily would be compelled to lower their hub-spoke fares to the level of the hidden-city fares that achieve positive savings.[19] Otherwise, in the absence of any prohibition, a passenger's economically rational response would be to purchase a hidden-city ticket at a lower fare.

To be sure, it is possible to view this result as "overcompensating" the plaintiff class. As Dr. Beyer has testified, Plaintiffs' alleged injury is measured by the extent to which Defendants' hidden-city prohibitions have contributed to the Airlines' "hub premiums," and he further opined at the March 1 hearing that these prohibitions might not account for the totality of these premiums. (*See* 3/1/01 Hearing Tr. at 96.) In addition, as discussed earlier, there is no particular reason to believe that hidden-city fares are a wholly accurate measure of any hub premiums currently imposed by the Airlines. Accordingly, to the extent that damages are determined in this case by reference to hidden-city fares, there is reason to doubt whether this is an accurate proxy for the anticompetitive effects of Defendants' present hidden-city prohibitions.

This, in the end, highlights a principal difficulty in this case—namely, that a ban on hidden-city ticketing is not *per se* anticompetitive, but is merely a device through which the Airlines allegedly preserve their artificially high hub-spoke fares. Stated differently, if it were determined that Defendants' hub-spoke fares are *not* artificially high, but instead reflect competitive and other lawful factors, then the Airlines would be perfectly entitled to continue their hidden-city prohibitions as a means of preserving a legitimate price differential between their hub-spoke and hidden-city routes. Under these circumstances, an inherent "chicken-and-egg" concern is raised in this case, and Defendants quite properly point out that the mere existence of hidden-city savings opportunities, by itself, says nothing about the lawfulness of the Airlines' fare structures. Nevertheless, the Court finds that Plaintiffs and their experts have provided enough in the way of additional, independent evidence and analysis of allegedly anticompetitive conduct to overcome this concern, at least at the present juncture.[20]

### IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Defendant Airlines' November 15, 2000 Motion to Strike Expert Testimony is DENIED. IT IS FURTHER ORDERED that Plaintiffs' March 9, 2001 Expedited Motion to File Expanded Post–Hearing Brief is GRANTED.

---

**19.** Viewed from this perspective, Dr. Beyer's "minimum average" approach arguably underestimates Plaintiffs' damages, since it is based upon the fare code that achieved the smallest average savings percentage during a given quarter. The Airlines arguably might be compelled to reduce their fares below this point, down to the level of the lowest available hidden-city fare, in order to prevent passengers from availing themselves of this maximum hidden-city savings opportunity.

**20.** As should be evident from this and similar qualifying language throughout this Opinion, it is by no means definitively resolved that the trier of fact will be permitted to consider each and every aspect of Dr. Beyer's testimony. Rather, under a more complete record at trial, the Court might well conclude what it is unable to conclude here—namely, that Dr. Beyer's testimony fails, on one or more issues, in whole or in part, to satisfy the admissibility standards set forth in Rule 702.